# COUNTY COUNCIL FOR MONTGOMERY COUNTY, MARYLAND *v.* INVESTORS FUNDING CORPORATION ET AL.

[No. 282, September Term, 1972.]

*Decided December 4, 1973.*

404

The cause was argued on May 15, 1973, before MURPHY, C. J., and BARNES, McWILLIAMS, SMITH and DIGGES, JJ., and reargued on October 10, 1973, before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*William J. Chen, Jr., Assistant County Attorney*, with whom were *Richard S. McKernon, County Attorney, Alfred H. Carter, Deputy County Attorney*, and *Stephen P. Johnson, Assistant County Attorney*, on the brief, for appellant.

*Amicus Curiae* brief filed by Prince George's County, Maryland, *Joseph S. Casula, County Attorney, Glenn T. Harrell, Jr.* and *Nelson M. Oneglia, Associate County Attorneys*, on the brief.

*David Huddle*, with whom were *William P. Daisley* and *Michael C. Blackstone* on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court. BARNES and SMITH, JJ., concur in part and dissent in part and BARNES, J., filed an opinion concurring in part and dissenting in part in which SMITH, J., concurs at page 446 *infra.*

This appeal draws into question the legality of Chapter 93A of the Montgomery County Code (1965, as amended), entitled "Fair Landlord-Tenant Relations." * Enacted as Bill 19-71 by the County Council for Montgomery County (the Council) on June 13, 1972, Chapter 93A (the Act) undertakes in four separate articles to comprehensively regulate the apartment rental business and its concomitant landlord-tenant relationships and activities in Montgomery County. Investors Funding Corporation, together with a number of other corporations and individuals engaged in the business of renting dwelling units in Montgomery County (the landlords), sought a declaratory decree in the Circuit Court for Montgomery County that the Act was null, void and of no effect because in a number of designated particulars, it violated the state and federal constitutions, and was otherwise beyond the power of the Council to enact. The court (Moore, J.) concluded in an extensive oral opinion that while the Council possessed the basic power under the County's Home Rule Charter to enact Chapter 93A, various of its provisions were illegal, unconstitutional or otherwise nugatory as being in conflict with the public general laws of the State. From a decree so declaring, both the landlords and the Council appealed.

In enacting Chapter 93A, the Council made a number of "Legislative Findings" which it set forth in § 93A-1 of Article I of the Act, *viz.*, that: "there is often unequal bargaining power between landlords and tenants; that the common law principles pursuant to which leases are interpreted as grants of right of possession rather than mutual and dependent covenants evolved in an agricultural setting and are ill-suited to the modern residential setting of

---

* This Chapter was recently recodified as Montgomery County Code (1972), Chapter 29; consistent with the citations in the lower court's decision, we shall refer to the Act as originally codified.

this urban County; that in order to facilitate fair and equitable arrangements, foster the development of housing which will meet the minimum standards of the present day, and promote the health, safety and welfare of the people, it is necessary and appropriate that the County provide a commission and office to determine certain minimum rights and remedies, obligations and prohibitions, for landlords and tenants of certain kinds of residential property." The underlying "purposes and policies" of the Act are set forth in § 93A-2(b):

\* \* \*

> "(i) to simplify and clarify the law governing the rental of dwelling units;
> (ii) to encourage landlords and tenants to maintain and improve the quality of housing in this County;
> (iii) to assure fair and equitable relations between landlords and tenants; and
> (iv) to revise and modernize the law of landlord and tenant to serve more realistically the needs of an urban society developing within Montgomery County, Maryland."

Section 93A-3 provides that, subject to the public general laws of the State, the Act "shall regulate and determine legal rights, remedies and obligations of the parties and beneficiaries of any rental agreement, concerning any multi-family structure containing two or more rental dwelling units within this County wherever executed."

The Office of Landlord-Tenant Affairs is created by § 93A-6 of Article II of the Act and placed under the immediate supervision of an Executive Director; the Office is designated as a principal office of the executive branch of the Montgomery County government, and is vested with primary authority for implementing the Act's provisions. The Executive Director is empowered by § 93A-7 "to initiate, investigate and conciliate any violations of this Chapter or any complaints filed hereunder, and to investigate, grant,

deny, revoke, suspend, refuse or renew licenses hereunder." A Commission on Landlord-Tenant Affairs is created by § 93A-8 of Article II; it is comprised of nine members appointed by the County Executive, three of whom are to be selected from nominations made by organizations representing landlords; three from nominations made by organizations representing tenants; and three members of the public at large who are neither tenants nor landlords. The Commission's powers are delineated in § 93A-9; among them is the power to enforce the provisions of the Act "through any appropriate means; including but not limited to . . . (ii) the imposition of a civil penalty, not in excess of $1,000, for the violation of any provision of this Chapter, (iii) the imposition of an award of money damages against a landlord or tenant for the benefit of either as may be provided for in this Chapter, (iv) the ordering of repairs by a landlord or tenant, and (v) the investigation and conciliation of any violations of this Chapter or any complaints filed hereunder and the investigation of any matter relating to any license to conduct or operate a rental facility."

Article III of the Act, entitled "Licensing of Rental Facilities," provides in § 93A-16 that after the Act's effective date (September 19, 1972), "it shall be unlawful to conduct or operate within Montgomery County a rental facility without having first applied for or obtained a license to operate or conduct said rental facility . . . ." [1] Failure to comply with the licensing requirements is declared a misdemeanor by § 93A-17, punishable by a fine not to exceed $1,000 and costs for each offense. Landlords of rental facilities are required by § 93A-18 to apply to the Office of Landlord-Tenant Affairs for licenses within twenty days after the Act's effective date. Provision is made for the issuance of temporary and conditional licenses pending inspection of

---

1. A rental facility is defined in § 93A-4(m) to mean: "any structure, or combination of related structures and appurtenances, operated as a single entity in which the operator thereof provides for a consideration two or more dwelling units; but shall not be construed to mean any transient facilities such as boarding houses, tourist homes, inns, motels, hotels, school dormitory, hospitals or medical facilities; and any facilities operated for religious or eleemosynary purposes."

rental facilities and compliance with all applicable laws; and the Executive Director is vested with authority to determine whether the rental facility for which licensure is sought conforms with the governing law. Section 93A-19 provides that an annual license fee per dwelling unit shall be established by the County Executive by written regulation "in an amount sufficient to pay the costs incidental to the administration of this Chapter and to make this Chapter self-sustaining." Section 93A-21 authorizes the Executive Director to cause biennial inspections to be made of licensed rental facilities to determine whether they comply with all applicable laws; if the rental facility fails so to comply, the license "may be subject to revocation or other remedial action as determined by the Executive Director." Section 93A-24 authorizes the Executive Director to revoke, deny or suspend licenses for failure to eliminate violations of applicable laws; persons aggrieved by the action of the Executive Director may file an appeal to the Commission which is required "by order, [to] either reverse, modify or affirm the action appealed and shall issue its findings, opinion, and order in writing and provide a copy thereof to the person aggrieved." The Commission's "final action" is appealable to the Circuit Court for Montgomery County. § 93A-25.

Article IV of the Act is entitled "Landlord-Tenant Obligations." Section 93A-26 mandates that all leases or agreements for the occupancy of a dwelling unit in a rental facility located in Montgomery County must comply with a number of specified "[l]ease requirements"; included among such requirements is that leases be executed in duplicate (and thus be in writing); that they be for two-year initial terms, at the tenant's option; that they contain no authorization for confession of judgment for rent due; and that such leases provide a guarantee that no retaliatory action will be taken by the landlord for any bona fide complaints made by the tenant to designated persons and agencies. Sections 93A-29 and 30 outline a number of "obligations" with which tenants and landlords are required to comply. Sections 93A-31 through 33 deal with complaints

filed with the Executive Director of "defective tenancies" [2] and lease agreement violations. The Executive Director is required by § 93A-34 to investigate all such complaints to determine "whether a violation of this Chapter has occurred or a defective tenancy exists"; if he makes an affirmative finding, he is required by § 93A-36 to undertake conciliation of the complaint, and to notify the Commission if his efforts are not successful. Section 93A-40 deals with hearings before the Commission to determine whether the provisions of the Article have been violated. Where the Commission finds that the landlord has caused a defective tenancy, § 93A-43(b) specifies that "all affected tenants" may be entitled to immediate termination of their leases, to return of their security deposits and of certain rental monies previously paid to the landlord, to an award of damages from the landlord sustained as a result of the defective tenancy, not to exceed $1000, and to an amount to be paid by the landlord equivalent to a reasonable expenditure adequate to obtain temporary substitute rental housing in the area. Where the Commission finds that a tenant has caused a defective tenancy, the landlord, by § 93A-43(c), may be entitled to terminate the lease, and to an award of damages from the tenant sustained as a result of the defective tenancy, not exceeding $1000. The Commission's award of damages may be enforced by the landlord or tenant "in any court of competent jurisdiction, and any such court is authorized to grant judgment for such monies plus interest from the date of the award." § 93A-43(c)(ii). Failure to comply with "any Commission order or summons" is made a misdemeanor, punishable by a fine up to $1000. § 93A-44(a). An appeal to the Circuit Court for Montgomery County from a "final action" of the Commission rendered under the Article is authorized by § 93A-45.[3]

---

**2.** A "defective tenancy" is defined in § 93A-4(e) to mean: "any condition in a rental facility which constitutes a violation of the terms of the lease or any provision of this Chapter or constitutes a violation of any law, regulation or code."

**3.** The Council held extensive public hearings over a four-day period before enacting Chapter 93A; in addition, it held twelve public work

In holding that the Council had the basic authority under its Home Rule Charter to enact local legislation regulatory of the apartment rental business and landlord-tenant relationships and activities within the County, the lower court placed reliance upon our decision in *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 252 A. 2d 242 (1969). That case, as here, involved an enactment of the County Council for Montgomery County under its Home Rule Charter, and we there extensively reviewed the history and purpose of Article XI-A of The Constitution of Maryland (the Home Rule Amendment) and the Express Powers Act, Maryland Code (1957, 1973 Repl. Vol.), Article 25A, and particularly § 5 thereof. We noted that § 2 of Article XI-A provides that the General Assembly, by public general law, shall "provide a grant of express powers for such County or Counties as may thereafter form a charter . . . ," and that § 4 provides that after the adoption of a charter by any County, no public local law shall be enacted by the General Assembly for that County on any subject covered by the express powers granted as provided in § 2. Section 3 provides that after the adoption of a charter, a County Council:

> "subject to the Constitution and Public General Laws of this State, shall have full power to enact

---

sessions attended by representatives of landlords and tenants who participated in the drafting of the Act. The Act purports to be a legislative reflection of the Council's recognition that, demographically, Montgomery County is burgeoning, and that there is an imperative need to provide limited local regulation and control of the apartment rental business and its concomitant landlord-tenant relationship. Evidence adduced before the Council, and included in the record before us, shows that in 1940, the County's population was 83,912, but by 1960, it had grown to 340,928. From 1950 to 1960, the County's population growth was 107.4 per cent. Between 1960 and 1966, an additional 97,952 persons were added to the County's population. By 1970, the population of the County had grown to 522,809 people; by 1985, the County's population is projected to reach 763,000. The record discloses that, in 1970, there were 50,315 apartments in the County; the increase in apartment housing in the County from 1960 to 1970 amounted to 205.3 per cent. Of approximately 87,000 building permits issued between 1960 and the first six months of 1970, almost two-thirds were for apartment units: garden apartments, elevator buildings and townhouses. Statistical projections indicate that by 1985, it will be necessary to increase the number of apartments in the County by 38,450 and that to accommodate the future population of the County, approximately 75,000 acres of land will be needed.

local laws of said . . . County including the power to repeal or amend local laws of said . . . County . . . , upon all matters covered by the express powers granted . . . ."

Under the grant of express powers given to chartered counties by Article 25A of the Code, power was granted in § 5(A) "[t]o enact local laws for such county, including the power to repeal or amend local laws thereof enacted by the General Assembly upon the matters covered by the express powers in this article granted; to provide for the enforcement of all ordinances, resolutions, bylaws and regulations adopted under the authority of this article by fines, penalties and imprisonment, enforceable according to law as may be prescribed, but no such fine or penalty shall exceed $1,000.00 for any offense or imprisonment for more than six months." Following the enumeration of specific powers granted to chartered counties in § 5, subsection (S) thereof provides:

"The foregoing or other enumeration of powers in this article shall not be held to limit the power of the county council, in addition thereto, to pass all ordinances, resolutions or bylaws, not inconsistent with the provisions of this article or the laws of the State, as may be proper in executing and enforcing any of the powers enumerated in this section or elsewhere in this article, as well as such ordinances as may be deemed expedient in maintaining the peace, good government, health and welfare of the county.

Provided, that the powers herein granted shall only be exercised to the extent that the same are not provided for by public general law; provided, however, that no power to legislate shall be given with reference to licensing, regulating, prohibiting or submitting to local option, the manufacture or sale of malt or spirituous liquors."

Summarizing the powers granted to the Council, we said in *Greenhalgh, supra,* 253 Md. at 160-62, 252 A. 2d at 246-47:

"The Council, having been given 'full' legislative power as specified by Art. XI-A, is also given statutory power to pass 'all' ordinances it deems expedient under the police power and the only limit on its powers is stated to be that such an ordinance cannot be inconsistent with the provisions of Art. 25A or the laws of the State, and the further provisos 'that the powers herein granted shall only be exercised to the extent that the same are not provided for by public general law' and that 'no power to legislate shall be given with reference to licensing, regulating, prohibiting or submitting to local option, the manufacture or sale of malt or spirituous liquors.'

\* \* \*

The purpose and intent of the legislature in supplying the implementation called for by Art. XI-A by the passage of the express powers act was to take from the legislature and give to the County the exclusive power to enact local laws, and the reasons for this delegation of power, commonly called home rule, were first to see as far as possible the log jam of unacted on measures in the late days of the legislative session in Annapolis which had caused passage of laws that had not received careful scrutiny or due consideration and, second, 'to permit local legislation to be enacted solely by those directly affected by it without interference from representatives of other sections of the State.' *Scull* . . . [*v. Montgomery Citizens League*, 249 Md. 271, 274, 239 A. 2d 92, 94 (1968).]

Gratification would not be afforded the purposes of home rule or the reasons which prompted it if the language of § 5 (S) of Art. 25A were not to be construed as a broad grant of power to legislate on matters not specifically enumerated in Art. 25A and the language of that section clearly indicates that such a construction is sound. See 4 Antieau,

*Local Government Law: County Law,* § 31.05. Similar power had been given Montgomery County in 1945 by Ch. 947 of the Laws of 1945 which survived the adoption of the charter and now in general substance is § 2-23 of the Montgomery County Code (1965). See, *Scull,* pp. 283-284 of 249 Md.

A grant of power to pass laws for the peace, good government, health and welfare of the community is sometimes referred to as 'a general welfare or general grant of power clause,' 6 McQuillin, *Municipal Corporations* (3rd Ed.), § 24.43, and:

'Under it ordinances may be passed which are necessary and beneficial, and they will be adjudged valid by the courts, provided they are reasonable and consonant with the general powers and purposes of the local corporation, and not inconsistent with the United States Constitution, treaties and statutes, and the laws and policy of the state.'

It is true, as McQuillin points out in § 24.45 that a number of courts have taken the view that a general grant of power to a municipal corporation authorizes only the carrying out of the specific powers delegated to it, but even if it be assumed that such a point of view is sound in the abstract the language of § 5 (S) negates the idea that this was its intent, for not only does it empower legislative action designed to carry out, exercise and implement enumerated powers, it goes further to add that power is given 'as well' to ordain for the maintenance of peace, good government, health and welfare of the County. McQuillin notes in § 24.44 that 'A general welfare or similar clause, granting extremely broad power to a municipal corporation, is liberally construed to accord a municipality wide discretion in the exercise of the police power,' and he says:

'The cases, indeed, reveal an increasing judicial inclination under such a clause to accord to municipal authorities wider discretion in the reasonable and non-discriminatory exercise, in good faith, of the police power in the public interest. While under the clause, or under the guise of it, personal and property rights recognized by general law and guaranteed by organic provisions cannot unreasonably be restrained, courts uniformly regard the clause as ample authority for a reasonable exercise, in good faith, of broad and varied municipal activity to protect the health, morals, peace and good order of the community, to promote its welfare in trade, commerce, industry and manufacture, and to carry out every appropriate object contemplated in the creation of the municipal corporation.' "

Our recognition in *Greenhalgh* of the expansive nature of the legislative powers conferred upon the Council by Article 25A, § 5 (S), coupled with our holding that, pursuant to such power, the Council could enact a fair housing law prohibiting racial and religious discrimination in the sale or rental of housing in the County is, we think, clear authority for the lower court's ruling that the Council was empowered to enact local legislation regulatory of the apartment rental business and landlord-tenant relationships in Montgomery County. *See also, McBriety v. City of Baltimore*, 219 Md. 223, 232-233, 148 A. 2d 408, 414 (1959). Indeed, the landlords do not directly challenge the basic power of the Council to legislate in this field; they maintain, instead, that in enacting Chapter 93A, the Council has illegally exercised its power in a number of instances.[4]

---

4. On appeal, the landlords have abandoned their contention, made in the lower court, that the provisions of Acts of 1971, ch. 649, § 12, expressly revoked the power of the Council to enact legislation on the subject of landlord-tenant affairs.

## I.

### The Power of the Council to Change the Common Law

Contending that the Council does not possess the power to revise, amend or repeal the common law of Maryland, the landlords seek to invalidate those provisions of the Act which are concededly in derogation of the common law, *viz.:*

(1) that all leases be executed in duplicate, and a copy provided to the tenant;

(2) that all leases be offered for an initial two-year term at the tenant's option, unless a reasonable cause exists for offering a different initial term;

(3) that all leases contain the landlord's express warranty of habitability and covenant to repair, and imposing such obligation upon the landlord;

(4) that all leases guarantee a tenant reasonably attempting to enforce his rights protection from retaliatory action by the landlord;

(5) that no lease authorize the landlord to take possession of the premises or the tenant's personal property therein without formal legal process;

(6) that all leases permit the tenant to terminate the lease, on thirty days' written notice and payment of a reasonable charge not to exceed two months' rent, due to an involuntary change of employment from the Washington metropolitan area or for other reasonable cause beyond the tenant's control;

(7) that the County Attorney may, on referral of a complaint by the Commission, bring an action to preserve the status quo pending resolution of the complaint.

The landlords reason that Article 5 of the Maryland Declaration of Rights expressly guarantees to the

inhabitants of this State the common law of England, subject to revision, amendment or repeal only by the State Legislature; that the Declaration of Rights and the Maryland Constitution are to be interpreted as one instrument; that Article XI-A, § 3 of the Maryland Constitution grants charter home rule counties the power to enact local laws, subject to the Constitution; that the Council's power to enact local laws is, therefore, subject to the limitation that such local laws may not amend, revise or repeal the common law, that power expressly being reserved to the State Legislature.

Article 5 of the Declaration of Rights provides in pertinent part:

"That the Inhabitants of Maryland are entitled to the Common Law of England . . . and to the benefit of such of the English statutes as existed on the Fourth day of July, . . . [1776] . . . except such as . . . may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State. . . ."

We have previously considered the intent of the framers in adopting the common law as a part of the law of this State. In *Lickle v. Boone*, 187 Md. 579, 582, 51 A. 2d 162, 163 (1947), we noted:

"In 1776 the framers of the Constitution of Maryland adopted the common law as a part of the law of this State. The provision in the Declaration of Rights 'that inhabitants of Maryland are entitled to the Common Law of England' referred to the mass of the common law as it existed in England at that time, or as it prevailed in Maryland either practically or potentially, except such portions thereof as were inconsistent with the spirit of the Constitution and the nature of our new political institutions. Md. Declaration of Rights, Art. 5; *State v. Buchanan*, 5 Har. & J. 317, 358, 9 Am. Dec. 534."

Apparent from our previous discussion of Article XI-A of the Constitution is our conclusion that its underlying purpose is to share with the counties, within well delineated limits, the legislative powers formerly reserved to the General Assembly.[5] That purpose would be substantially frustrated by the construction urged by the landlords. The body of English common law referred to in Article 5 of the Declaration of Rights undoubtedly impinges on many areas now recognized by the Express Powers Act as proper subjects of local legislation.[6] The General Assembly has the power to revise the common law but no power to enact local legislation within the area delegated by the Express Powers Act to charter home rule counties. Article XI-A, § 4. If, conversely, charter home rule counties have the power to enact local legislation, but no power to revise the common law, local legislation which necessitated any revision of the common law would be impossible. As indicated, the purpose of home rule was to share the legislative power with the counties, not to diminish or extinguish it. The construction proposed by the landlords, so obviously contrary to the intent of the Constitutional drafters, must be rejected. We think implicit within the grant of "full power" to chartered counties contained in § 3 of Article XI-A is the grant of the power formerly reserved by the Declaration of Rights to the State Legislature, to alter, revise, or amend the English common law within the express powers granted. To the extent that such a grant by the Constitution is inconsistent with Article 5 of the Declaration of Rights, the Constitution

---

**5.** *See also*, Moser, "County Home Rule — Sharing the State's Legislative Power with Maryland Counties," 28 Md. L. Rev. 327 (1968).

**6.** The landlords concede that home rule counties in Maryland "have for years been repealing, amending, and revising the Common Law," as indeed they inevitably must if they are to pass local legislation. For example, Article 25A, § 5 (X) specifically grants local power to regulate zoning; such regulation is admittedly in derogation of the common law right to use private property so as to realize its highest utility. *See*, Aspen Hill Venture v. Montgomery County, 265 Md. 303, 313-14, 289 A. 2d 303, 308 (1972). The ordinance which we approved in Greenhalgh (prohibiting racial discrimination in housing sales and rentals) clearly repealed the common law principles whereby the owner of real property had the absolute right to rent or sell to whomever he pleased.

must prevail. *Baltimore v. State*, 15 Md. 376 (1860); *Anderson v. Baker*, 23 Md. 531 (1865).

We thus conclude that the Council had the authority, within the limits of the powers granted to it by Article XI-A and the Express Powers Act, to enact Chapter 93A containing provisions in derogation of the common law. In so holding, we have considered the case of *Genusa v. City of Houston*, Tex. Civ. App., 10 S.W.2d 772 (1928), relied upon by the landlords; we do not, however, find it persuasive and decline to follow it in this State.

## II.

### Conflict Between Chapter 93A and the Public General Laws of the State

The lower court, in applying the constitutional mandate of Article XI-A, § 3 -- "that in case of any conflict between said local law and any Public General Law now or hereafter enacted the Public General Law shall control" -- held that several provisions of Chapter 93A were in conflict with State law and were, therefore, null, void and of no effect. Invalidated on these grounds were provisions concerning retaliatory eviction, written leases, two-year lease terms, and judgments by confession.

The express language of the Constitution, Article XI-A, § 3, is clear and unambiguous; its proper application, however, has often proved difficult. In *City of Baltimore v. Sitnick & Firey*, 254 Md. 303, 317, 255 A. 2d 376, 382 (1969), Judge Finan, for the Court, comprehensively reviewed our previous decisions on the question of conflict between a local law and a public general law within the meaning of Article XI-A, giving this succinct summary:

> "A distillation of the opinions we have cited leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted. Stated another way, unless a general public law contains an express denial of the right to

act by local authority, the State's prohibition of certain activity in a field does not impliedly guarantee that all other activity shall be free from local regulation and in such a situation the same field may thus be opened to supplemental local regulation."

In *Sitnick*, we reasoned that Baltimore City, under the powers granted it under Article XI-A, could "supplement" the Statewide minimum wage law by a city ordinance establishing minimum wage standards higher than those set by state legislation and could include within the provisions of the ordinance businesses exempted from the state legislation. We noted, 254 Md. at 324-25, 255 A. 2d at 386, that:

"In none of the provisions of the . . . City law [found by the lower court to conflict with the State law] does it authorize a minimum wage which is lower than that provided by the State law, nor does it exempt any employees included under the State law; we think this is the crucial norm which must be used to measure the City law regarding any conflict with the statute."

The situation before us, unlike *Sitnick*, (and many of the cases discussed therein) does not involve the direct conflict inherent in a dual regulatory scheme, since in the instant case, Montgomery County has attempted to comprehensively regulate the apartment rental business and landlord-tenant affairs, but the State has not. The theory of permissible "supplementation" of State law by local ordinance is, therefore, inapposite.

Manifestly, whether a conflict exists between Chapter 93A and the public general law concerning real property can only be determined by reviewing the provisions of each in light of the controlling precedents.

(a) Retaliatory Eviction

Chapter 93A contains three provisions relating to

retaliatory evictions: Section 93A-26(o) requires the landlord to expressly covenant that no retaliatory action will be taken against a tenant who attempts to enforce his rights under the lease or applicable law; Sections 93A-28 and 93A-39 make such action unlawful; Section 93A-39 further creates a rebuttable presumption that any eviction (except eviction for non-payment of rent) instituted within six months following a tenant's complaint to the local agency is retaliatory.

The lower court held that § 93A-26(o) was not in conflict with any public general law. However, it invalidated §§ 93A-28 and 93A-39 as in conflict with the "summary eviction" law contained in Article 53 of the Maryland Code, and further decreed § 93A-41, authorizing the County Attorney to institute a civil action to preserve the status quo during the pendency of a complaint, "invalid to the extent that it purports to permit (a) any intervention in, or defense to any possessory action brought under the provisions of Article 53 . . . ; or (b) an action to enjoin, prohibit, or otherwise interfere with any such possessory action."

The summary action for repossession claimed to invalidate these provisions is now contained in Maryland Code (1957, 1973 Repl. Vol.), Article 21, § 8-402(b).[8] It provides, in essence, that the District Court shall order restitution of leased premises to the landlord if it finds that the tenant, after receiving the notice, refused to vacate at the expiration of the lease.

The landlords, relying heavily upon *Heubeck v. City of Baltimore*, 205 Md. 203, 107 A. 2d 99 (1954), maintain that Article 21, § 8-402(b), a general public law, expressly permits

---

8. Chapter 349 of the Acts of 1972, a major legislative effort to coherently restate and recodify the real property law of Maryland, repealed the public general laws which formed the basis of the lower court's decision on retaliatory eviction, written leases, and two-year terms, and enacted substantially similar provisions now codified in Maryland Code (1957, 1973 Repl. Vol.), Article 21. While the appeal from the lower court's order became technically moot on January 1, 1973, the effective date of the repeal under Chapter 349, we, nevertheless, proceed to decide the issues on the basis of the existing law. *See*, Yorkdale v. Powell, 237 Md. 121, 205 A. 2d 269 (1964).

a landlord, whatever his motives, to evict a tenant after due notice and the expiration of the lease; that Chapter 93A, a local law, prohibits such eviction where it can be shown to be retaliatory; and that, therefore, a conflict exists within the meaning of the Home Rule Amendment and *all* sections of Chapter 93A dealing with retaliatory eviction must fall.

The Council seeks to avoid the clear conflict posited by the landlords, accepting the landlord's interpretation of the summary eviction law, but proffering a different interpretation of Chapter 93A. Sections 93A-28 and 93A-39, it maintains, merely create a "local cause of action" exposing a landlord to administrative, and ultimately, criminal sanctions if such eviction is later found by the Commission to be in retaliation for the tenant's exercise of a legal right. In the alternative, the Council argues that the summary eviction statute is procedural and not in conflict with a local law granting substantive rights, citing *Warren v. City of Philadelphia*, 382 Pa. 380, 115 A. 2d 218 (1955) and *Wagner v. Mayor and Municipal Council*, 42 N. J. Super. 193, 126 A. 2d 71 (1956), *rev'd on other grounds*, 24 N. J. 467, 132 A. 2d 794 (1957). Lastly, the Council seeks to bolster the validity of the retaliatory eviction provisions by reference to Maryland Code Article 21, § 8-213.1, effective July 1, 1973, expressly prohibiting retaliatory evictions in Montgomery County.

We think the issue was substantially settled by our decision in *Heubeck*, *supra.* That case invalidated a Baltimore City rent control ordinance which provided that so long as a tenant remained in possession and paid the maximum rent permitted under the ordinance, a landlord could not seek to recover possession of the premises even if the lease had expired. We there held, 205 Md. at 210-11, 107 A. 2d at 103:

> "The Public General Law, applicable to the entire State, provides for the eviction of tenants holding over at the expiration of their terms, if proper notice has been given. . . . The Rent Control Ordinance, therefore, prohibits an action which the Public General Law permits, that is, the eviction of

a tenant upon the expiration of his lease. Under the test laid down in the *Rossberg* case [111 Md. 394, 74 A. 581 (1909)] and adhered to in the *Levering* case, [134 Md. 48, 106 A. 176 (1919)], there is a conflict between the ordinance and Public General Law, and as between the two, the Public General Law prevails. . . ."

We are not persuaded to alter that conclusion by the fact that the prohibition of Chapter 93A operates indirectly and circuitously. By making *unlawful* the action which the Public General Law *permits*, this ordinance clearly creates a conflict within the meaning of Article XI-A, § 3, and frustrates the purpose of the State law to allow a landlord repossession without exception.

Nor can we agree that the summary eviction statute is merely procedural. The summary eviction statute, which has been in force and relied upon in Maryland for over a century, *Messall v. Merlands Clubs, Inc.*, 244 Md. 18, 222 A. 2d 627 (1966) has during that time provided some procedural details, *Darling Shops Delaware Corp. v. Baltimore Center Corp.*, 191 Md. 289, 60 A. 2d 669 (1948), *Benton v. Stokes*, 109 Md. 117, 71 A. 532 (1908), but it also, we think, insures the substantive right to such a remedy. It, therefore, cannot be modified by a conflicting local law. This reasoning is implicit in our holding in *Heubeck.*

Nor do we think that a contrary result is mandated by Article 21, § 8-213.1, effective July 1, 1973, expressly prohibiting retaliatory evictions in Montgomery County. That section, applicable only in Montgomery County, does not purport to amend or modify the summary eviction procedure contained in § 8-204(b) so as to obviate a conflict between the latter section and the local ordinance.[9]

We, therefore, affirm that part of the lower court's decree invalidating §§ 93A-28 and 93A-39. Since the public general laws as we have interpreted them, grant a landlord a legal

---

**9.** The validity of § 8-213.1 is not before us and we make no comment thereon.

right to evict, whether in retaliation or otherwise, the County may not require him to agree not to do so. Therefore, § 93A-26(o) is also invalid.

### (b) Two-Year Lease Terms

Sections 93A-26(b) and 93A-27(c) require that all leases entered into after the effective date of Chapter 93A be offered for an initial term of two years, at the tenant's option, unless a reasonable cause exists for offering an initial term other than two years. The lower court invalidated these two sections, noting in its opinion:

> "We read Article 53 as authorizing tenancy at will and at sufferance, tenancy for specific periods of time, tenancies up to three years. This is permitted by Article 53.
>
> In the Court's judgment the requirement here in subsection (b) making it mandatory that they be offered for a specific period of time, two years, is a conflict of a direct nature."

After a careful reading of the provisions referred to (now contained in Article 21, § 8-402(b)(1), (4), and (5), see n. 8, *supra*), we disagree. Article 21 provides a procedure whereby a landlord may recover possession of property leased "for any definite term or at will." It does not create the different types of tenancies, but merely recognizes those created by common law. As noted *supra*, Part I, the Council may alter the common law and a conflict with the common law will not invalidate otherwise proper local legislation. Unlike the retaliatory eviction provisions, nothing in Chapter 93A conflicts with the procedure established by Article 21, § 8-402(b), nor deprives anyone of a right intended to be secured by that public general law. We think something more than the mere mention of the different types of leaseholds is required to show the intent of the General Assembly to establish each of those tenancies beyond further regulation by local governments.

## (c) Written Leases

The lower court also declared invalid, as conflicting with State law, § 93A-26(a) which requires that leases be executed in duplicate and a copy provided to the tenant at the time of execution. Again, in our opinion, the lower court was correct. This provision is in conflict with the provisions of Art. 21, §§ 2-101 and 2-102 of the recently adopted Statute of Frauds, which provides:

"Section 2-101 — Certain estates created by parol are estates at will.

"All corporeal estates, leasehold or freehold, or incorporeal interests in land made or created by parol and not in writing and signed by the party so making or creating the same, or his agent lawfully authorized by writing, shall have the force and effect of estates or interests at will only, and shall not either in law or equity be deemed or taken to have any other or greater force or effect."

"Section 2-102 — Three-year exception.

"Section 2-101 above is not applicable to leasehold estates not exceeding the term of three years from the making thereof."

It is clear to us that oral leases, valid at common law, are recognized and *permitted* by the public general law and hence may not be prohibited by the Council in view of *Sitnick* and *Heubeck, supra.*

## (d) Confessed Judgment for Rent Due

Section 93A-26(g) provides that a lease shall "contain no authorization for confession of judgment for rent due." The lower court found this provision in conflict with Article 52, § 52 of the Maryland Code; the matter is now controlled by Maryland District Rule (MDR) 645.[10]

---

**10.** Chapter 181, Acts of 1972, repealed Article 52 of the Code in its entirety. The provision referred to by the lower court is now covered by Maryland District Court Rule 645 and we decide the issue on the basis of the latter, *see* n. 8 *supra.*

MDR 645 details the procedure by which the clerk of the District Court may enter a judgment by confession. That rule, pursuant to the authority vested in us by § 18A of Article IV of the Constitution, was duly approved and adopted by this Court on June 28, 1971; subsequent amendments to MDR 645 were approved and adopted on May 8, 1972. It is clearly a rule of procedure having "the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law." Article IV, § 18A. See also, Maryland Code (1957, 1973 Repl. Vol.), Article 26, § 25.

We need not decide whether MDR 645 is the equivalent of a general public law within the meaning of the Home Rule Amendment, for, assuming *arguendo* that it is, we do not perceive a conflict. That Rule merely details the procedure applicable when a confessed judgment is properly consented to by the defendant. We see nothing in the Rule to deprive home rule counties of the right to regulate the areas in which such consent can be validly given.

### III.

Exercise of Judicial Power by an Administrative Agency

The landlords contend that the lower court was correct in finding certain provisions of Chapter 93A unconstitutional as vesting in an administrative body judicial powers reserved exclusively to the courts by Article IV, § 1 of the Maryland Constitution, which provides in pertinent part:

> "The Judicial power of this State shall be vested in a Court of Appeals, and such intermediate courts of appeal, as shall be provided by law by the General Assembly, Circuit Courts, Orphans' Courts, such Courts for the City of Baltimore, as are hereinafter provided for, and a District Court; all said Courts shall be Courts of Record, . . . ."

The powers conferred on the Commission found by the lower court to be violative of Article IV, § 1 were these:

(1) to impose a civil penalty not exceeding $1,000;

(2) to award money damages not exceeding $1,000;

(3) to award payments for temporary substitute housing;

(4) to terminate leases;

(5) to order repairs;

(6) to order the return of security deposits and rental monies paid.[11]

---

**11.** The enforcement powers of the Commission, as detailed in §§ 93A-9(c) and 93A-43, are, in pertinent part, as follows:

93A-9(c): "The Commission shall be empowered to enforce the provisions of this Chapter through any appropriate means; including but not limited to . . . (ii) the imposition of a civil penalty, not in excess of $1,000 for the violation of any provision of this Chapter, (iii) the imposition of an award of money damages against a landlord or tenant for the benefit of either as may be provided for in this Chapter, (iv) the ordering of repairs by a landlord or tenant. . . ."

93A-43: Commission action; violation of Chapter or defective tenancy found.

"(a) If, at the conclusion of the hearing, the Commission determines, upon the preponderance of the evidence of record, that a violation of this Chapter has occurred or a defective tenancy exists, the Commission shall state its findings and issue an order. Such order shall require the respondent to cease and desist from such unlawful conduct and to take such appropriate action as will effectuate the purposes of this Chapter. The order shall also contain a notice that if the Commission determines that the respondent has not, after fifteen (15) calendar days following service of the Commission's order, made a bona fide effort to comply with the order, the Commission will refer the matter to the County Attorney for enforcement

(b) Where the Commission finds that a landlord has caused a defective tenancy, all affected tenants may be entitled to one or more or all or part of the following remedies as ordered by the Commission:

(i) immediate termination of their leases, and return of their security deposits and all rental monies already paid to the landlord from the period the landlord was notified of the said condition, and relief from any and all future obligations under the terms of the lease. Where the termination of a lease is ordered, the dwelling unit shall be vacated within a reasonable period of time.

(ii) an award of damages to be paid by the landlord sustained as a result of the defective tenancy, such damages being determined as the actual damage or loss. In the case of loss of services, such damage shall be proportionate to the amenity lost. In the case of damages to persons or property,

The Council contends that these powers are not judicial powers reserved to the Courts, but rather are adjudicatory and quasi-judicial functions which constitutionally can be delegated to an administrative agency. The difference between the position of the Council and that of the landlords is more than a mere semantic one; it involves concepts that go to the essence of the still developing law of administrative agencies.

Seldom has the precise issue now before us — *i.e.*, the limits of adjudicatory powers which can, within the Maryland Constitution, be conferred on an administrative agency — been adjudicated in this State. In *Solvuca v. Ryan & Reilly Co.*, 131 Md. 265, 101 A. 710 (1917), we upheld the then newly enacted Workmen's Compensation Act. The basic scheme of that Act created a commission to hold hearings, with the power to compel the appearance of witnesses and the production of documents (enforceable by the Circuit Court) and determine compensation for injured

---

an award for damages shall not exceed One Thousand Dollars ($1000.00) per affected dwelling unit.

(iii) an amount to be paid by the landlord equivalent to a reasonable expenditure adequate to obtain temporary substitute rental housing in the area.

(c) Where the Commission finds that a tenant has caused a defective tenancy, the landlord may be entitled to one or more or all or part of the following remedies as ordered by the Commission:

(i) the landlord may immediately terminate the lease and gain possession in accordance with the provisions of Article 53 of the Annotated Code of Maryland. Other remedies available to the landlord shall be as provided by State law.

(ii) an award of damages to be paid by the tenant to the landlord sustained as a result of a defective tenancy, such damages being determined as the actual damage or loss but not exceeding One Thousand Dollars ($1,000.00) with a credit for any damages which may have been deducted from the security deposit. Any award of damages or money under this section not paid within thirty (30) days from such award may be enforced by the landlord or tenant to whom the award was granted in any court of competent jurisdiction, and any such court is authorized to grant judgment for such monies plus interest from the date of the award."

workmen in certain circumstances according to the schedule contained in the Act. Employers were required to secure the payment of compensation, as provided in the Act, in one of three ways: (1) by insuring through the state accident fund; (2) insuring through an authorized insurance company; (3) furnishing the commission with satisfactory proof of ability to pay such compensation and depositing a sufficient amount with the commission. Appeal was allowed to the circuit courts and then to the Court of Appeals. In finding no constitutionally impermissible delegation of judicial power, we quoted with approval from *Borgnis v. Falk Co.*, 147 Wis. 327, 358, 133 N. W. 209, 219 (1911):

> ". . . [the Commission administering the Workmen's Compensation law] is an administrative body or arm of the government, which in the course of its administration of a law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts quasi-judicially; but it is not thereby vested with judicial power in the constitutional sense."

We then adopted a similar position, holding, 131 Md. at 284, 101 A. at 716:

> "The Workmen's Compensation Law, which was passed in the exercise of the police power of this State, creates a commission known as the State Industrial Accident Commission to administer the provisions of the Act. In the discharge of its duties and the exertion of its powers it is required to exercise judgment and discretion, and to apply the law to the facts in each particular case, but it is clear that the Legislature never intended to constitute the Commission a Court, or to confer upon it the judicial power of the State within the meaning of the constitutional provision referred to."

In *Mattare v. Cunningham*, 148 Md. 309, 129 A. 654 (1925),

we reiterated our holding in *Solvuca* that the Workmen's Compensation Act did not violate Article IV, § 1, further noting that the Commission created thereunder had no power to enforce its awards.

Subsequent cases have involved less direct challenges to the exercise of administrative power, by questioning the consequences which flow from granting "quasi judicial" powers to various boards. In *Dal Maso v. Board of County Commissioners*, 182 Md. 200, 34 A. 2d 464, 466 (1943), in the course of deciding that the actions of the Montgomery County Commissioners sitting as the District Council, were not *res judicata*, we noted:

"There is some confusion as to the nature and character of these administrative boards, and there are many opinions and text writers who refer to them as quasi-judicial. They do hear facts, and based on them, make decisions, but those decisions are not judgments or decrees. If their findings, resolutions, or orders are resisted or ignored, they must call on the courts to enforce them. Administrative boards and officials are arms and instrumentalities of the Legislature, and are not judicial at all; they belong to and derive all their authority from the legislative branch under our form of government. In this State, all judicial authority is only such as is provided for by Article 4 of the Maryland Constitution, and it has been decided that only judicial functions can be exercised which find their authority in that Article . . . , and that no court not coming within its provisions can be established in this State. This forbids any power in the Legislature to clothe administrative boards with any judicial authority. There may be states in which it can be done, but Maryland is not one of them."

Cases subsequent to *Dal Maso* have tempered but not overruled that holding. In *Hecht v. Crook*, 184 Md. 271, 277,

40 A. 2d 673, 675 (1945), decided two years after *Dal Maso*, we said:

> "This court pointed out in the recent case of *Dal Maso v. County Comm'rs*, 182 Md. 200, 34 A. 2d 464, that the latter term [(quasi judicial)] does not imply any power in the Legislature to clothe administrative boards with judicial authority. Nevertheless, the fact remains that innumerable controversies are decided today, by boards of legislative creation, of a character that traditionally fell within the scope of judicial inquiry."

*Heaps v. Cobb*, 185 Md. 372, 379, 45 A. 2d 73, 76 (1945) noted in a similar vein:

> "Administrative boards in general may be said to act in a quasi judicial capacity insofar as they have the duty to hear and determine facts and, *based on them*, to make decisions. . . . the boards, however, are not clothed with judicial authority, which the legislature has no power to confer upon them, Article 4, Md. Constitution; *Dal Maso v. Board*, etc., 182 Md. 200, 34 A. 2d 464, and their decisions, when they impair personal or property rights, are not irreviewable. The legislature is without authority to divest the judicial branch of the government of its inherent power to review actions of the administrative boards shown to be arbitrary, illegal or capricious, and to impair personal or property rights; but the courts are likewise without authority to interfere with any exercise of the legislative prerogative within constitutional limits, or with the lawful exercise of administrative authority or discretion."

These and other cases led the court in *Schultze v. Montgomery County Planning Board*, 230 Md. 76, 80, 185 A. 2d 502, 504 (1962) to conclude that the Planning Board's

duties of determining facts necessitated its exercising a quasi-judicial function, and to note: "Many cases since *Dal Maso v. County Comm'rs*, 182 Md. 200, 34 A. 2d 464 (1943), have made it clear that notwithstanding anything therein said, administrative bodies or officers may exercise such power." The holding in *Schultze* was approved in *Hyson v. Montgomery County Council*, 242 Md. 55, 64, 217 A. 2d 578, 584-85 (1966), that case identifying the quasi-judicial function as ". . . resolv[ing] disputed questions of adjudicative facts (as contradistinguished from legislative facts or judicial *action*) concerning particular parties." By the time of *Public Service Commission v. Hahn Transportation, Inc.*, 253 Md. 571, 253 A. 2d 845 (1969), we no longer found it necessary to distinguish *Dal Maso*, saying at 253 Md. at 580, 253 A. 2d at 850:

> "Beyond question the Public Service Commission exercises quasi-judicial functions when on a record before it, consisting of pleadings, . . . exhibits and testimony which later may undergo judicial scrutiny, it must after oral and written arguments determine adjudicative facts and choose the applicable law to produce a decision."

This gradual relaxation of the tension between Article IV, § 1 and the practical exigencies of administrative bodies has been largely justified by reservation of ultimate authority in the courts. In *Burke v. Fidelity Trust Co.*, 202 Md. 178, 187-89, 96 A. 2d 254, 260 (1953), we rejected the contention that the Bank Commissioner, empowered in certain bank mergers to effect a final and binding valuation of dissenting stockholders' shares (a function previously reserved to the courts), was thereby vested with judicial power. We there noted: "The substitution of compulsory arbitration and administrative review for a judicial valuation is not beyond the constitutional power of the legislature, so long as there is an opportunity for court review to pass on the legality and due process aspects of the award." This theory is more fully explained in the historical development of administrative law so eloquently articulated by Chief Judge Hammond in

*State Insurance Commissioner v. National Bureau of Casualty Underwriters*, 248 Md. 292, 298-300, 236 A. 2d 282, 285-87 (1967):

"In the earlier days of the exercise of governmental powers by administrative bodies, there was widespread fear that the delegating of administrative, legislative and judicial powers or functions to a single agency not only violated the theory of separation of powers but spelled its death knell. Emotional resentment against the rise of administrative power by lawyers and judges rose and resulted in efforts to thwart or destroy this veritable fourth branch of government by invoking the separation of powers theory or using the nondelegation doctrine or requiring a full and complete de novo judicial determination. These efforts had no more success than had the plaintiff in the case of King Canute versus The Sea. Legislatures, national and state, steadily continued to increase administrative agencies and administrative power, 1 Davis, Administrative Law Treatise § 1.01 (1958), and as these agencies have proliferated they have come to legislate more than legislatures and to adjudicate more than courts. 1 Cooper, *State Administrative Law*, pp. 1-2 (1965), the author says:

'In several states, as many as sixty or seventy independent agencies make rules and adjudicate contested cases affecting in varied ways the lives, health, fortunes, safety, labor, and the business of millions of citizens. At a conservative estimate [as of 1965], more than 2000 state administrative agencies are exercising legislative and judicial functions.' "

Judge Hammond then pinpointed the essential concern of those disturbed by the power delegated to administrative agencies:

"The early fears of the bar and bench have largely disappeared with experience. It became apparent that the complex problems of modern social, economic and industrial life for ever-increasing numbers of knowledgeable people could be solved or settled more expeditiously, effectively, cheaply and simply by administrative processes than by the traditional executive, legislative and judicial processes, because the blending of powers in one agency, which operates in its particular field or specialty continuously over the years and produces an expertise and a superior ability both correctly to evaluate specialized questions and to supply correct answers to these questions — often due largely to the staff of permanent, expert employees who serve under the successive heads of the agencies; and secondly, it was recognized that the dangers inherent in government by administrative bodies lie not in the blending of powers in a single body but in permitting that body's power to be beyond check or review.

The checks on administrative power have been supplied. 1 Davis, *op. cit.* § 1.09, pp. 68-69, says that in the establishment and control of administrative agencies in recent decades:

'* * * the principle that has guided us is the principle of check, not the principle of separation of powers. We have had little or no concern for avoiding a mixture of three or more kinds of power in the same agency; we have had much more concern for avoiding or minimizing unchecked power. The very identifying badge of the modern admin-

istrative agency has become the combination
of judicial power (adjudication) with legisla-
tive power (rule making). But we have taken
pains to see that the agencies report to and
draw their funds from our legislative bodies,
that the personnel of the agencies are ap-
pointed and reappointed by the executive, and
that the residual power of check remains in
the judiciary.' "

Judge Hammond then noted the response of this Court to
the exercise of quasi-judicial power by administrative
agencies:

"The courts have been alert to exercise their
residual power to restrain improper exercises of
administrative powers whether judicial or
legislative in nature. If the legislature has not
expressly provided for judicial review, a court will
ordinarily utilize its inherent powers to prevent
illegal, unreasonable, arbitrary or capricious
administrative action. In *Heaps v. Cobb*, 185 Md.
372, 379, this Court said: 'The legislature is without
authority to divest the judicial branch of the
government of its inherent power to review actions
of administrative boards shown to be arbitrary,
illegal or capricious, and to impair personal or
property rights; * * *,' and then quoted the opinion
in *Hecht v. Crook*, 184 Md. 271, 280:

'Courts have the inherent power, through the
writ of mandamus, by injunction, or otherwise,
to correct abuses of discretion and arbitrary,
illegal, capricious or unreasonable acts; but in
exercising that power care must be taken not to
interfere with the legislative prerogative, or
with the exercise of sound administrative
discretion * * *.' "

Relying upon the clear rationale of the *State Insurance
Commissioner* case, the Council contends that Montgomery

County properly determined that the well-being of all its citizens would best be served by an administrative forum which, within certain limits regulates the apartment rental business and landlord-tenant relationships within the County. It was recognized, the Council asserts, that the problems currently existing in the field could within the precise language employed by us in *State Insurance Commissioner*, "be solved or settled more expeditiously, effectively, cheaply and simply by administrative processes than by traditional executive, legislative and judicial processes, because the blending of powers in one agency . . . produces an expertise and a superior ability both correctly to evaluate specialized questions and to supply correct answers . . ." 248 Md. at 299, 236 A. 2d at 286. The constitutional doctrine of separation of powers is, generally speaking, not applicable to local government, *Barranca v. Prince George's County*, 264 Md. 562, 287 A. 2d 286 (1972) and as the Maryland cases now indicate, the existence of that doctrine does not itself inhibit the delegation to an administrative agency of a blend of executive or legislative powers with powers judicial in nature; the determining factor is not so much the specific powers granted to the administrative agency, but rather the relationship of the courts to the exercise of that power. *See* Davis, *Administrative Law* § 2.13 (1970 Supp.); Brown, "Administrative Commissions and the Judicial Power," 19 Minn. L. Rev. 261 (1935); 1 Am. Jur. 2d *Administrative Law* § 154 (1962).

Despite the preservation of judicial powers in the courts through the "theory of checks," as adopted by this Court in the *State Insurance Commissioner* case, the landlords contend that the Commission has been delegated judicial power to effect the remedies expressly provided in the Act. They refer to five factors as indicia of judicial power: (1) the power to make a final rather than an initial determination; (2) the power to make binding judgments; (3) the power to affect the personal or property rights of private persons; (4) the exercise of power formerly held by a court; and (5) the fashioning of remedies which are judicial in nature.

As to the first of these objections, it is clear that the

Commission's determinations are not final, but always open to judicial review by an aggrieved party. In *Johnstown Coal & Coke Co. v. Dishong*, 198 Md. 467, 472-74, 84 A. 2d 847, 850 (1951), we held that "[t]he law is settled that . . . questions of fact may be finally determined by an administrative agency" so long as the courts retain their inherent power to assess the sufficiency of evidence to support such factual conclusions and to review the actions of administrative agencies which are illegal, arbitrary, unreasonable or which impair personal or property rights. Clearly, with the exception hereinafter noted, the provisions for judicial review provided in Chapter 93A are sufficient under the *Dishong* standard.[12]

Second, the Commission does not make "binding judgments" of the kind that denote strictly judicial power, *see*, 1 Am. Jur. 2d *Administrative Law* §§ 170, 173 (1962); the Commission has no power to force compliance with its orders. Court action, instituted by the County Attorney or the parties before the Commission, is always required.

Third, while the Commission obviously has the power to affect property rights of private persons, both landlords and tenants, such power is delegated on the basis of the declared public interest in landlord-tenant relationships. 1 Am. Jur. 2d *Administrative Law* § 171 (1962). Section 93A-1 contains the legislative finding of public interest similar to that which justified the initiation of an administrative procedure affecting the rights of private employers and employees (the Workmen's Compensation Act) approved by us in *Branch v. Indemnity Insurance Co., supra.*

Fourth, the fact that the administrative procedure created by Chapter 93A permits the agency to adjudicate some matters formerly decided by the courts is not determinative. Indeed, this was in effect the situation approved by us in

---

12. That no provision is made for a de novo trial on appeal from the final action of the Commission does not constitute a deprivation of the right to a jury trial in violation of the Constitution of Maryland. See Branch Indemnity Insurance Co., 156 Md. 482, 144 A. 696 (1929) and Petillo v. Stein, 184 Md. 644, 42 A. 2d 675 (1945); Thomas v. Penn. R. Co., 162 Md. 509, 160 A. 793 (1932).

*Burke v. Fidelity Trust Co.*, *supra*, and in *Solvuca v. Ryan & Reilly Co.*, *supra*, and is consistent with powers granted innumerable administrative agencies functioning in this State.

Fifth, and most strenuously pressed by the landlords, is the asserted fact that the remedies entrusted to the Commission's discretion are remedies exclusively reserved to the courts. Consistent with our decisions, hereinbefore set forth, we think the power to fashion such remedies, viewed in the context of Chapter 93A, is more properly classified as quasi-judicial, or as described in *Hyson v. Montgomery County Council*, *supra*, 242 Md. at 62, 217 A. 2d at 583, a power "not purely and completely judicial . . . in nature, but hav[ing] qualities or incidents resembling . . . [such power]."

Courts in other jurisdictions have recognized that administrative agencies, if they are to effectively fulfill the purposes for which they were created, may constitutionally be vested with broad remedial powers. In *Jackson v. Concord Co.*, 54 N. J. 113, 126, 253 A. 2d 793, 800 (1969), involving an administrative agency charged with enforcement of the State's antidiscrimination law, the court sustained the agency's award of compensatory damages for the economic loss suffered by the person discriminated against, stating:

> "Initially, we may say that, at this advanced date in the development of administrative law, we see no constitutional objection to legislative authorization to an administrative agency, to award, as incidental relief in connection with a subject delegable to it, money damages, ultimate judicial review thereof being available."

In *Massachusetts Commission Against Discrimination v. Franzaroli*, 357 Mass. 112, 256 N.E.2d 311 (1970), a statutory provision in an antidiscrimination law was approved which empowered the administrative agency to award damages not exceeding $1,000 for expenses incurred by the complainant for obtaining alternative housing or space, for storage of goods and effects, for moving and for other costs actually

incurred by him. To like effect, see *Williams v. Joyce*, 4 Or. App. 482, 479 P. 2d 513 (1971) and *Zahorian v. Russell Fitt Real Estate Agency*, 62 N. J. 399, 301 A. 2d 754 (1973). In *State v. Bergeron*, 290 Minn. 351, 187 N.W.2d 680 (1971), the court approved an administrative order which compelled cancellation of a transfer of property made in violation of the State's antidiscrimination statute and required that the property be offered for sale to the complainant. The Supreme Court of Washington, in *Rody v. Hollis*, 81 Wash. 2d 88, 500 P. 2d 97 (1972), upheld an administrative award of damages for discrimination in a housing transaction; in approving the granting of administrative discretion to fix the amount of the award up to $1,000, the court said:

"All that can, and should, be done is to define the conduct sought to be punished, or the injury to be compensated, set out the normally acceptable limits of punishment or compensation, and then allow the adjudicative body to determine the appropriate punishment or compensation by applying general principles of morality and traditional concepts of justice." (500 P. 2d at 100).

In *Ford v. Environmental Protection Agency*, 9 Ill. App. 3d 711, 292 N.E.2d 540 (1973), the court approved an order of the Pollution Control Board assessing a $1,000 civil penalty against the owner of a solid refuse disposal site found to be in violation of statute and the rules of the agency. There, the law authorized the Board to impose such monetary penalties not to exceed $10,000. In rejecting the argument that the power to impose such a civil penalty was a judicial power which could not be conferred upon an administrative agency, the court stated, 292 N.E.2d at 544 that "an administrative officer or agency may penalize, without offending the constitution when the penal function is incidental to the duty of administering the law." The court said:

"Although the essentially legislative and judicial powers cannot be delegated, we believe it implicit in the authorities that where direct or immediate judicial action is inexpedient or impractical,

quasi-judicial functions may be conferred upon and exercised by an administrative agency, provided the laws conferring such powers are complete in their content; are designed to serve a general public purpose; are such as to require a consistent and immediate administration; and further provided that all administrative actions are subject to judicial review." (292 N.E.2d at 543-44).

While administrative impositions of civil penalties are commonplace within the State and Federal government structures (see 1 Davis, *Administrative Law*, § 2.13 (1959), the 1970 Supplement thereto, and cases cited) not all states agree that administrative agencies may constitutionally be empowered to impose civil monetary penalties for violations of law or of the rules of the agency. See, for example, *State ex rel. Lanier v. Vines*, 274 N. C. 486, 164 S.E.2d 161 (1968) holding unconstitutional, as a delegation of judicial power, authority vested in the Commissioner of Insurance to determine the amount of a civil monetary penalty; and *Broadhead v. Monaghan*, 238 Miss. 239, 117 So. 2d 881 (1960), holding that in the absence of a definite legislative standard, an administrative agency could not constitutionally be vested with discretionary power to impose a tax delinquency penalty of not less than 10% nor more than 25% of the delinquent amount. Compare *Wycoff Co. v. Public Service Commission*, 13 Utah 2d 123, 369 P. 2d 283 (1962), upholding the imposition of a civil penalty assessed by the Public Service Commission under a statute authorizing a penalty of not less than $500 nor more than $2,000 for each statutory violation. See also 1 Am. Jur. 2d *Administrative Law*, § 173.[13]

We think the grant of remedial powers to the Commission to award money damages, terminate leases, order repairs and the return of security deposits and rental monies paid,

---

**13.** The power of adjudication to determine guilt or innocence in criminal cases cannot constitutionally be conferred upon administrative agencies because the criminal defendant is entitled to special procedural protection of a kind not given in civil proceedings in court or in proceedings before administrative agencies. Helvering v. Mitchell, 303 U. S. 391, 58 S. Ct. 630, 82 L. Ed. 917 (1938).

and to award funds for temporary substitute housing does not constitute an invalid delegation of judicial power to an administrative agency in violation of the Maryland Constitution. As to the granting of these powers, we are in full agreement with the Council's observation that "(T)he pivotal point in determining the permissible extent of delegable adjudicatory functions is not merely their inherent nature but the context of the regulatory scheme and the enforcement procedure provided by the administrative process." We think it plain that the function of the Commission is primarily administrative and the power vested in it to hear and determine controversies involving landlords and tenants is granted only as an incident to its administrative duty; in other words, the Commission's function is not primarily to decide questions of legal rights between private parties, but is merely incidental, although reasonably necessary, to its regulatory powers. *See* 1 Am. Jur. 2d *Administrative Law* § 160.

The power vested in the Commission by § 93A-9(c) to enforce the provisions of the Act by imposing a civil penalty not exceeding $1,000 "for the violation of any provision of this Chapter" is far more elastic than its power to award money damages to a landlord or tenant for actual loss suffered by reason of the Commission's finding of a defective tenancy. Indeed, it is readily apparent that the Commission has unrestricted, unbridled discretion in fixing the amount of the penalty, within broad limits, up to $1,000 without regard to the nature or gravity of the violation. While we conclude that the authority to impose a civil monetary penalty is not a power beyond constitutional delegation to an administrative agency, we think the discretion vested in the Commission to fix the amount of the penalty in any amount up to $1,000, for any violation of the Act, in the total absence of any legislative safeguards or standards to guide it in exercising its discretion, constitutes an invalid delegation of legislative powers and otherwise violates due process of law requirements. See *Theatrical Corp. v. Brennan*, 180 Md. 377, 24 A. 2d 911 (1942), involving a statute which prohibited the holding of various types of

public entertainment in Baltimore City without first paying a fee between $5 and $100 as set by the Police Commissioner; we there held the statute invalid because it did not provide any standard to control the Commissioner's discretion, there being nothing in the nature of the various types of public entertainment to provide meaningful guidance to the Commissioner or a means of reviewing alleged abuses of his discretion. See Cohen, *Some Aspects of Maryland Administrative Law*, 24 Md. L. Rev. 1, 6-7. We recognize, of course, that the trend of cases is toward greater liberality in permitting grants of discretion to administrative officials, particularly in the fields of public health and safety, in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increase. *Marek v. Board of Appeals*, 218 Md. 351, 146 A. 2d 875 (1958); *Pressman v. Barnes*, 209 Md. 544, 121 A. 2d 816 (1956); *Givner v. Commissioner of Health*, 207 Md. 184, 113 A. 2d 899 (1954). We hold here that because of the complete lack of any legislative safeguards or standards, the grant of unlimited discretion to the Commission to fix civil penalties in any amount up to $1,000 is illegal. No meaningful judicial review of the Commission's assessment of such penalties would appear possible in light of the unrestricted nature of the discretion sought to be vested in the Commission. In this connection, we note that judicial review of final actions of the Commission shall be by "appeal to the Circuit Court for Montgomery County in accordance with the Maryland Rules of Procedure for a review of such action." §§ 93A-25 and 93A-45. Undoubtedly, the Council contemplated that review of the Commission's final action would be in accordance with Chapter 1100 of the Maryland Rules, Subtitle B, regulating appeals from administrative agencies, and authorizing the court to "affirm, reverse or modify the action appealed from, remand the case to the agency for further proceedings, or dismiss the appeal as now or hereafter provided by law." Rule B12. While neither the Act nor the Rules explicitly specify the substantive test to be applied in reviewing agency determinations, and the Administrative Procedure Act (APA), Maryland Code, Article 41, §§ 244-256A, is not

by its terms applicable to county administrative agencies, *Urbana Civic v. Urbana Mobile*, 260 Md. 458, 272 A. 2d 628 (1971), we think the Council intended that the standard of judicial review be reconciled with that contained in § 255 (g) (1)-(5), inclusive, of the APA. See *County Fed. S. & L. v. Equitable S. & L.*, 261 Md. 246, 274 A. 2d 363 (1971). Section 255(g), insofar as pertinent, provides:

> "The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions; or
> (2) In excess of the statutory authority or jurisdiction of the agency; or
> (3) Made upon unlawful procedure; or
> (4) Affected by other error of law; or
> (5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; . . . ."

We thus conclude that, with the exception of the power to impose civil monetary penalties, all the remedial powers vested in the Commission by Chapter 93A are legal and constitutional.[14]

IV.

Due Process

(a) Hearing

The lower court, by its order of October 6, 1972, voided §

---

**14.** In view of our conclusion, we find it unnecessary to give detailed consideration to the Council's alternate position that since the Act does not create a "court of record" within the contemplation of Article IV, § 1 of the Maryland Constitution, the delegation of judicial or quasi-judicial powers to the Commission could in no event be unconstitutional. We think the argument, on its face, is completely without merit since all judicial power is vested in the courts designated in the cited provision of the Maryland Constitution.

93A-24(c) which provided that in the event the Executive Director revoked, denied or suspended a license to operate a rental facility, the aggrieved party could appeal to the Commission on Landlord-Tenant Affairs, and further provided that upon such appeal, the Commission *may* hold a hearing. Relying upon *Albert v. Public Service Commission*, 209 Md. 27, 120 A. 2d 346 (1956), the lower court voided § 93A-24(c), and related provisions, noting:

> "The Court considers that the requirements of procedural due process are violated by this section of the statute. We consider that it is an important element of our law that there be afforded procedural due process in connection with the revocation of a license involving, in this case a property right; namely, the right of the landlord to operate an apartment facility."

By the court's further order of October 17, 1972, made after consideration of the parties' stipulation as to severability, it was decreed that Article III of Chapter 93A ("Licensing of Rental Facilities") was void in its entirety, "the licensing procedures and functions contained therein being wholly ineffective without the provisions of Section 93A-24" which the court previously declared void.

Subsequent to the lower court's order, and prior to the briefing of this appeal, Chapter 93A was amended, effective November 28, 1972. Among the provisions amended was § 93A-24(c); as amended, the section now provides that upon an appeal from the Executive Director to the Commission, "the Commission *shall* conduct a hearing at which time an opportunity to be heard *shall* be given to the person aggrieved."

It is, of course, well settled that "a change in the law after a decision below and before final decision by the appellate Court will be applied by that Court unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent." *Yorkdale v. Powell*, 237 Md. 121, 205 A. 2d 269 (1964). Section 93A-24(c), as amended, making the right to a hearing absolute, and not

discretionary with the Commission, fully comports with procedural due process requirements. The landlords make no contention to the contrary, and accordingly, we shall vacate that part of the lower court's decree invalidating Article III in its entirety.

### (b) Landlord's Right of Entry

The landlords contend that § 93A-26(s) is void as an arbitrary, capricious and unreasonable exercise of the police power. That section requires that a lease:

"contain a provision requiring that the landlord exercise his right to access to any dwelling unit, after due notice to the tenant, and without objection from the tenant, in order to make necessary repairs, decorations, alterations, or improvements, supply services only by mutual agreement during normal business hours except in an emergency; to exhibit the dwelling unit to prospective purchasers, mortgagees, or tenants only during normal business hours, including weekends, except as otherwise may be agreed upon by the parties; and providing that nothing in this subsection shall prevent the landlord from entering any leased premises in an emergency situation or, after due notice, when the landlord has good cause to believe the tenant may have damaged the premises or may be in violation of this Chapter."

The lower court refused to invalidate this section, and, in its opinion, noted that it did not consider the provision arbitrary and capricious. Nor do we.

The landlords' objection to the section appears to be that they should not be forced to wait until emergency conditions exist before entering an apartment to make necessary repairs without the consent of the tenant; and (2) that a landlord should be able to make routine inspections, whether or not he has cause to believe that damage has been done or that violations of Chapter 93A exist.

The objections of the landlords are more properly addressed to the legislative body. The wisdom of § 93A-26(s) is not, of course, a matter of our concern, and we find nothing in the section requiring its invalidation on the ground that it is arbitrary or capricious.

> *Decree vacated; case remanded for the entry of a decree consistent with this opinion; costs to be paid one-half by the County Council for Montgomery County and one-half by Investors Funding Corporation et al.*

*Barnes, J., concurring in part and dissenting in part:*

I concur with most of the majority opinion and I concur in the result in declaring unconstitutional the provisions of § 93A-9(c) of the Act. I dissent, however, in regard to the sustaining by the majority of the constitutionality of § 93A-43 (b)(i) and (ii) providing that when the Commission finds that a landlord has caused a defective tenancy, the affected tenants may be entitled to the following remedies: (a) the immediate termination of their leases; (b) the return of their security deposits and certain rental monies paid and relief from all future obligations under the terms of the lease; and (c) an award of damages (not exceeding $1,000.00) against the landlord, sustained as a result of the defective tenancy, the damages being determined as the actual loss; of § 93A-43(b)(iii) giving the tenants the right to an award by the Commission of an amount to be paid by the landlord equivalent to a reasonable expenditure adequate to obtain temporary rental housing in the area; of § 93A-43(c)(i) and (ii) giving similar rights of termination to landlords and an amount of damages against tenants; and, of §§ 93A-26(b) and 93A-27(c) requiring that all leases be offered by the landlord for an initial term of two years at the option of the tenant, unless a reasonable cause exists for an initial term other than two years.

I also dissent in regard to the *dictum* in the majority opinion indicating that certain provisions of the Administrative Procedure Act, Article 41, Sections 244-256A (APA) are, by construction of the Act, applicable to appeals from the Commission to the courts.

My reasons for dissent are (1) that the provisions of § 93A-43(b)(i), (ii) and (iii) and 93A-43(c)(i) and (ii) attempt to confer judicial powers and functions upon the Commission in violation of Article IV, Section 1 of the Maryland Constitution and Article 8 of the Declaration of Rights of that Constitution; (2) that the provisions of § 93A-26(b) and § 93A-27(c) are beyond the power of the Commission to adopt under Article XI-A of the Constitution and the Express Powers Act, inasmuch as Code (1957, 1973 Repl. Vol.) Article 21, Section 8-402(b)(1), (4) and (5) permits leases *for a definite term* as well as from year to year, month to month, and week to week so that such leases are permitted by a *public general law* of the State and may not be abolished by a *public local law* in light of our holding in *Mayor & City Council of Baltimore v. Sitnick & Firey*, 254 Md. 303, 255 A. 2d 376 (1969); and (3) that, in regard to the *dictum* relating to criteria for appeals derived by construction from the APA, there is no provision in the Act authorizing or justifying this *dictum*, which, in my opinion, represents "judicial legislation" in an aggravated form and violates the provisions of Article 8 of the Declaration of Rights of the Maryland Constitution. I am also of the opinion that § 93A-9(c) in regard to the imposition of a "civil" penalty not exceeding $1,000.00 as punishment for violation of the Act is unconstitutional for several reasons in addition to that relied upon by the majority.

## (1)

### *Delegation of Judicial Powers*

Much of the difficulty with the majority opinion in regard to the delegation of judicial powers and functions to the Commission, as well as with several of the opinions of this Court decided subsequent to *Dal Maso v. Board of County*

*Commissioners of Prince George's County,* 182 Md. 200, 34
A. 2d 464 (1943), results from a failure to appreciate fully
the *unusual and almost unique legal position* Maryland
occupies, so far as the delegation of judicial powers and
functions is concerned, as a result of the relevant provisions
of the Maryland Constitution.[1] Because of these
constitutional provisions, all of the opinions of the federal
courts, substantially all of the opinions of the courts of our
sister states (except those of New Mexico and possibly those
of North Carolina) and even opinions of Professor Davis,
himself, are not applicable or even persuasive in this State.

One of the relevant provisions of the present Constitution
is Article IV, Section 1, which provides:

> "The Judicial power of this State shall be vested
> in a Court of Appeals, and such intermediate courts
> of appeal, as shall be provided by law by the
> General Assembly, Circuit Courts, Orphans'
> Courts, such Courts for the City of Baltimore, as
> are hereinafter provided for, and a District Court;
> all said Courts shall be Courts of Record, and each
> shall have a seal to be used in the authentication of
> all process issuing therefrom."

This provision was, in similar form, included as Article
IV, Section 1 of the Constitution of 1851, which stated:

> "The judicial power of this State shall be vested
> in a court of appeals, in circuit courts, in such
> courts for the city of Baltimore as may be
> hereinafter prescribed, and in justices of the
> peace."

There was no comparable provision in the Constitution of
1776 and subsequent amendments to that Constitution,
although separation of powers was provided for as indicated
later.

---

1. The only constitutional provisions in regard to separation and
delegation of judicial powers which are comparable to the Maryland
constitutional provisions in this regard appear to be those in the New
Mexico Constitution. *See* State v. Mechem, 63 N. M. 250, 316 P. 2d 1069
(1957), *infra.*

In the Constitution of 1864, the provision of the Constitution of 1851 in regard to judicial power being vested in the enumerated courts was continued, with some embellishment in regard to a court seal and the process and official character of justices of the peace. This amplified provision in the 1864 Constitution was continued in identical words as Article IV, Section 1 of the present Constitution of 1867, and reads:

> "The Judicial power of this State shall be vested in a Court of Appeals, Circuit Courts, Orphans' Courts, such Courts for the City of Baltimore as are hereinafter provided for, and Justices of the Peace; all said Courts shall be Courts of Record, and each shall have a seal to be used in the authentication of all process issuing therefrom. The process and official character of Justices of the Peace shall be authenticated as hath heretofore been practiced in this State, or may hereafter be prescribed by Law."

Two amendments to Article IV, Section 1 of the present Constitution have occurred since the adoption of the Constitution of 1867. The first amendment was by the Laws of 1966, Ch. 10, ratified by the electorate on November 8, 1966, which added the language "and such intermediate courts of appeal, as shall be provided by law by the General Assembly." The second amendment was by the Laws of 1969, Ch. 789, ratified by the electorate on November 3, 1970. This last amendment eliminated the words "Justices of the Peace," substituted the words "a District Court" and eliminated the last sentence in regard to the process and official character of Justices of the Peace, thus giving the State the present provisions of Article IV, Section 1, first quoted.

It is thus seen that the theory of the vesting of judicial power *exclusively* in designated *courts* has continued explicitly since the adoption of the Constitution of 1851 to the present time and was last confirmed by the electorate on November 3, 1970, some three years ago. In short, this theory and express provision is current, viable, meaningful

and by no means ambivalent. Indeed, we indicated in *Maryland Committee for Fair Representation v. Tawes*, 228 Md. 412, 425-26, 180 A. 2d 656, 663 (1962):

> "Section 1 of Article IV of the Maryland Constitution vests the judicial power of the State in the Judiciary, and this encompasses *all* the judicial power of the State." (Emphasis in the opinion.)

It is also clear in Maryland that the judicial power is separate from the executive and legislative powers and that no officials or agencies of those other branches may exercise judicial powers.

Article 8 of the Declaration of Rights of the present Maryland Constitution (not referred to in the majority opinion) provides:

> "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and *no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.*" (Emphasis supplied.)

In the Constitution of 1776, Article VI of the Declaration of Rights merely sets forth the more usual provision in regard to separation of powers:

> "That the legislative, executive and judicial powers of government, ought to be forever separate and distinct from each other."

In the Constitution of 1851, this provision in the Constitution of 1776 was continued as Article 6 of the Declaration of Rights. However, the vital and effective clause, "and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other," was then added to Article 6. In sum, what was *hortatory* in the Constitution of 1776 was made *mandatory and effective* by the clause added by the provisions of the Constitution of 1851. This provision in the Declaration of Rights in the 1851 Constitution has been continued without

change in both the Constitution of 1864 (Article 8 of the Declaration of Rights and the present Constitution of 1867, as Article 8 of the Declaration of Rights, providing as already set forth.

I have not found provisions in the Constitutions of our sister states other than in New Mexico — and there are none in the federal constitution — specifically confining *all* judicial power to enumerated courts and forbidding persons exercising the functions of the executive or legislative branches of government from exercising judicial functions.

It is small wonder, therefore, that in *Dal Maso, supra*, Chief Judge Sloan, for a unanimous Court, stated:

> "In this State, all judicial authority is only such as is provided for by Article 4 of the Maryland Constitution, and it has been decided that only judicial functions can be exercised which find their authority in that Article (*Day v. Sheriff*, 162 Md. 221, 159 A. 602; *Humphreys v. Walls*, 169 Md. 292, 181 A. 735; *Quenstedt v. Wilson*, 173 Md. 11, 194 A. 354; *Levin v. Hewes*, 118 Md. 624, 86 A. 233), and that no court not coming within its provisions can be established in this State. This forbids any power in the Legislature to clothe administrative boards with any judicial authority. *There may be states in which it can be done, but Maryland is not one of them.*" (Emphasis supplied.) 182 Md. at 205, 34 A. 2d at 466.

Indeed, as I see it, there is no other conclusion possible in view of the express and unambiguous constitutional provisions in Article IV, Section 1 and in Article 8 of the Declaration of Rights of the present Constitution.

The majority indicates that cases "subsequent to *Dal Maso* have *tempered* but not overruled that holding." (Emphasis supplied.) No opinion of this Court, however, has so "tempered" it as has the opinion of the majority in the present case.

The device for the "tempering" has been the addition of the prefix "quasi" to the word "judicial," connected by a

hyphen, and, behold, two mandatory and unambiguous provisions in the Maryland Constitution, as well as the holding in *Dal Maso*, are "tempered" or, as I would put it, "gravely impaired." I am glad, however, that the holding in *Dal Maso* is not overruled by the majority, which would, indeed, have taken some doing. However, I confess difficulty in foreseeing a situation in which the holding in *Dal Maso* will be effectuated. But, "Sufficient unto the day is the evil thereof." (Mat. 6:34) No doubt, such situations will arise in the future and hopefully the holding in *Dal Maso* will render ineffective future attempts to delegate judicial functions and powers to agencies of the legislative or executive branches of the State government.

As mentioned, the device used to sustain what otherwise might be thought to be a delegation of judicial powers and functions to administrative agencies (usually of the legislative branch of the State government) is to attribute to the entirely proper delegation to such agencies by the General Assembly of *legislative powers and functions*, with proper guides and standards, the exercise of supposed *quasi-judicial* functions and powers, usually by way of *dicta*. I protested against this in my dissenting opinions in *MacDonald v. Board of County Commissioners for Prince George's County*, 238 Md. 549, 210 A. 2d 325 (1965); in *Woodlawn Area Citizens Association, Inc. v. Board of County Commissioners for Prince George's County*, 241 Md. 187, 216 A. 2d 149 (1966); and in *Delbrook Homes, Inc. v. Mayers*, 248 Md. 80, 234 A. 2d 880 (1967); and in my concurring opinions in *Hyson v. Montgomery County Council*, 242 Md. 55, 217 A. 2d 578 (1966) and in *Gaywood Community Ass'n v. Metropolitan Transit Authority*, 246 Md. 93, 227 A. 2d 735 (1967). In the *Woodlawn* dissent, I observed:

> "In *Schultze v. Montgomery County Planning Board*, 230 Md. 76, 79, 185 A. 2d 502 (1962) and in *Kay Construction Co. v. County Council for Montgomery County*, 227 Md. 479, 486, 177 A. 2d 694 (1962), both cited in the majority opinion, there is *dicta* which indicates that the County Council in

Montgomery County does exercise 'quasi-judicial functions.' In my opinion, this is unfortunate language, unnecessary to the decisions in those cases, which gives rise to the notion that the holding in *Dal Maso* has been somewhat impaired but not overruled. As I see it, in both cases the County Council was exercising a *'restricted legislative function,'* not a *'quasi-judicial function.'* It has been my observation that when the prefix 'quasi' is appended to a well-defined word, distinctions are blurred, fuzzy thinking is invited and error often results. Its use should be avoided."
241 Md. at 208, 216 A. 2d at 162.

As I see it, the majority opinion confirms how sound this observation was!

The extensive quotation in the majority opinion in the present case from the majority opinion in *State Insurance Commissioner v. National Bureau of Casualty Underwriters,* 248 Md. 292, 298-300, 236 A. 2d 282, 285-86 (1967) — much of it based upon the notions of Professor Davis in his *Administrative Law Treatise* (1958) — is all *dictum.* In that case, we considered the scope of appellate review of the rate-making powers of the Insurance Commissioner, which we treated as legislative in nature. This Court made no holding in regard to *any exercise of judicial powers* by an administrative body or official. Indeed, the question was whether or not the legislation imposed nonjudicial powers upon the courts. Chief Judge Hammond, for the majority of the Court, stated the holding, as follows:

"We hold that a court in reviewing *legislative* actions or decisions of an administrative agency may apply the weight of the evidence test to the factual findings of the agency, *without exercising nonjudicial functions,* provided it does not itself make independent findings of fact or substitute its judgment for that of the agency." (Emphasis supplied.)
248 Md. at 310, 236 A. 2d at 292.

In view of the use of the composite word "quasi-judicial" in a number of the prior opinions of this Court to describe — improperly in my opinion — certain functions of administrative agencies to which restricted legislative functions and powers have been properly delegated, it becomes necessary to seek to determine what are, on the one hand, "judicial" powers — which the majority concedes *may not be delegated* to administrative agencies — and "quasi-judicial" powers, on the other. It is admittedly difficult to draw the line of demarcation between "judicial" powers and "quasi-judicial" powers. Considerations of degree are obviously involved. It is clear to me that several of the provisions of the Act "cross the line," as it were, to an attempted grant of judicial power to the Commission. It will be helpful to take a close look at these offending provisions of the Act.

Section 93A-9 in regard to "Commission powers; generally" provides in Subsection (c):

> "(c) The Commission shall be empowered to enforce the provisions of this Chapter through any appropriate means; including but not limited to (i) the utilization of the services available through the Office of Landlord-Tenant Affairs, (ii) *the imposition of a civil penalty, not in excess of $1,000, for the violation of any provision of this Chapter, (iii) the imposition of an award of money damages against a landlord or tenant for the benefit of either as may be provided for in this Chapter, (iv) the ordering of repairs* by a landlord or tenant, and (v) the investigation and conciliation of any violations of this Chapter or any complaints filed hereunder and the investigation of any matter relating to any license to conduct or operate a rental facility."

Section 93A-43 in regard to "Commission action; violation of Chapter or defective tenancy found" provides:

> "(a) If, at the conclusion of the hearing, the Commission determines, upon the preponderance of

the evidence of record, that a violation of this Chapter has occurred or a defective tenancy exists, the Commission shall state its findings and *issue an order. Such order shall require the respondent to cease and desist from such unlawful conduct and to take such appropriate action as will effectuate the purposes of this Chapter.* The order shall also contain a notice that if the Commission determines that the respondent has not, after fifteen (15) calendar days following service of the Commission's order, made a bona fide effort to comply with the order, the Commission will refer the matter to the County Attorney for enforcement.

"(b) Where the Commission finds that a landlord has caused a defective tenancy, all affected tenants may be entitled *to one or more or all or part of the following remedies* as ordered by the Commission:

"(i) *immediate termination of their leases, and return of their security deposits and all rental monies already paid to the landlord from the period the landlord was notified of the said condition,* and relief from any and all future obligations under the terms of the lease. Where the termination of a lease is ordered, the dwelling unit shall be vacated within *a reasonable period of time.*

"(ii) *an award of damages* to be paid by the landlord sustained as a result of the defective tenancy, *such damages being determined as the actual damage or loss.* In the case of *loss of services, such damage shall be proportionate to the amenity lost.* In the case of *damages to persons or property, an award for damages shall not exceed One Thousand Dollars ($1,000.00) per affected dwelling unit.*

"(iii) *an amount to be paid by the landlord*

*equivalent to a reasonable expenditure adequate to obtain temporary substitute rental housing in the area.*

"(c) Where the Commission finds that a tenant has caused a defective tenancy, the landlord may be entitled to one or more or all or part of the following remedies as ordered by the Commission:

"(i) the landlord *may immediately* terminate the lease and gain possession in accordance with the provisions of Article 53 of the Annotated Code of Maryland. Other remedies available to the landlord shall be as provided by State law.

"(ii) an award of damages to be paid by the tenant to the landlord sustained as a result of a defective tenancy, such damages being determined as the *actual damage* or loss but not exceeding One Thousand Dollars ($1,000.00) with a credit for any damages which may have been deducted from the security deposit. *Any award of damages or money under this section not paid within thirty (30) days from such award may be enforced by the landlord or tenant to whom the award was granted in any court of competent jurisdiction, and any such court is authorized to grant judgment for such monies plus interest from the date of the award.* " (Emphasis supplied.)

The criminal provisions appear in § 93A-44 headed "Penalty for failure to comply with Commission orders or summons" and are as follows:

"(a) Any person who fails to comply with *any Commission order or summons issued pursuant to this Article shall be deemed guilty of a misdemeanor and, upon conviction, shall be subject to a fine not exceeding One Thousand Dollars*

*($1,000.00) and costs.* Fines imposed hereunder may be collected or enforced through *civil attachment* proceedings. *Each day that a person fails to comply with an order of the Commission as specified herein shall constitute a separate offense hereunder,* except that where said person makes a bona fide effort to comply with this Chapter, no penalty shall lie for that period of time when the person is making a bona fide effort to so comply.

"(b) Where a person, rather than comply with a Commission order, *chooses to cease the conduction or operation* of a rental facility, he shall give any tenants occupying the premises in question sixty (60) days written notice to vacate the premises, said period to begin on the first day of the month following service of said notice. A copy of said notice must be delivered to the Executive Director. *No penalty will lie during the sixty (60) day period that tenants have to vacate the facility,* provided that the holder of the license to conduct or operate the rental facility relinquish it and submit it to the Executive Director.

"(c) In addition to any criminal or other penalty herein provided, compliance with an order of the Commission may be effectuated *by injunctive or other appropriate action or proceeding to correct any violation of this Article, and any court of competent jurisdiction may issue restraining orders, temporary or permanent injunctions or other appropriate forms of relief.*"
(Emphasis supplied.)

What then is the criteria for the determination of whether power attempted to be delegated to an administrative body is "judicial"?

In 1 Am. Jur. 2d *Administrative Law* (1962), the following criteria are set forth:

(1) "It is the power to make a final rather than an initial determination." *Id.* at § 160.

458

(2) "[I]t is the inherent authority not only to decide but to make binding orders or judgments which constitutes judicial power, . . . ." *Id.* at § 170.

(3) "[S]uch power affects the personal or property rights of private persons or involves the determination of private controversies under the law." *Id.* at § 171.

The provisions of the Act, already quoted in full with appropriate emphasis, attempt to confer upon the Commission the following powers:

"(a) imposition of a civil penalty not exceeding $1,000

(b) termination of leases

(c) ordering the return of security deposits and rental monies paid

(d) award of money damages

(e) ordering repairs

(f) awarding of payments for temporary substitute housing."

Measured by the criteria mentioned, these powers are all essentially "judicial." The Commission has the power to make final determinations, rather than initial determinations, the Act providing that the party receiving the award may seek enforcement of it "in any court of competent jurisdiction" and that any such court "is authorized *to grant* judgment for such monies plus interest from the date of the award." (Emphasis supplied.) There is no provision for a trial or other judicial proceeding before such a judgment is entered. There is no authorization to the court *to deny* a judgment when an award is sued upon. Compare the provisions of the Act in this regard with the provisions of the Workmen's Compensation Law relating to awards of the Commission where the amounts are fixed by law and provision is made for what amounts to a *de novo* trial in the courts.

If a *de novo* trial on appeal were provided by the Act from

the awards and decisions of the Commission, with the usual right of trial by jury, the right to offer evidence in Court, a determination of the facts by the trier of facts based upon a preponderance of the evidence, it might be argued that the improper delegation of judicial powers and functions was not prejudicial in that ultimately the person aggrieved by the Commission's action received complete judicial review, with the full exercise of the judicial power by the courts to which the Maryland Constitution grants such power.[2] The Act, however, does not attempt to provide for this type of judicial review.

It is quite true that in cases involving a delegation of legislative power to an administrative agency, our predecessors have held that even though the delegating legislation may provide that questions of fact may be finally determined by an administrative agency and may not be set aside, reversed or modified on appeal, the courts are not divested of their constitutional power and duty to review the actions of such administrative agencies "which are illegal, arbitrary, or unreasonable and which impair personal or property rights," as Judge Delaplaine aptly stated in *Johnstown Coal & Coke Co. v. Dishong*, 198 Md. 467, 473, 84 A. 2d 847, 850 (1951). The majority cites this case as indicating that "the provisions for judicial review provided in Chapter 93A are sufficient under the *Dishong* standard." In my opinion, its reliance on *Dishong* is misplaced. The *Dishong* case was not establishing "standards" for judicial review, but, on the contrary, was indicating that the courts could not be divested of their constitutional obligation to afford due process of law, even in the face of legislation purporting to eliminate such judicial consideration of decisions of administrative bodies to which restricted legislative power had been delegated.

The six powers in question are, in my opinion, clearly *judicial powers*, and are, therefore, powers traditionally

---

**2.** The argument, however, would not be sound in that judicial powers cannot constitutionally be delegated *at all* in view of the unique provisions of the Maryland Constitution, already mentioned, and our decision in the Dal Maso case.

460

exercised by the courts. They are not new rights, unknown to the common law, and thereby in substitution for traditional common law rights and procedures like those given by the Workmen's Compensation Law. What, indeed, could be more of a judicial power and function than fixing the amount of a penalty? *See Ordway v. Central Nat. Bank of Baltimore,* 47 Md. 217, 28 Am. Rep. 455 (1877) and *Doyle v. Baltimore County Comm'rs,* 12 G. & J. 484 (1842) as well as numerous other opinions since these two cases.

Surely, it is a judicial power and function to fix the amount of damages resulting from tortious action. *See Macke Laundry Service Co. v. Weber,* 267 Md. 426, 298 A. 2d 27 (1972) and *Evans v. Murphy,* 87 Md. 498, 40 A. 109 (1898) and the many other cases demonstrating this concept.

The power to declare a lease terminated or rescinded with an order for the return of security deposits and rental monies paid under the lease and the power to determine the amount to be paid for temporary substitute housing are powers traditionally exercised in proper circumstances by either the law or equity courts. *See Gostin v. Needle,* 185 Md. 634, 45 A. 2d 772, 163 A.L.R. 1013 (1946) and *Buschman v. Wilson,* 29 Md. 553 (1868) as well as other cases illustrating this principle. *See also* Code (1957, 1973 Repl. Vol.) Article 21, Section 8-213.

When these judicial powers are exercised by the *law courts,* the citizen has a constitutional right to trial by jury guaranteed by Article XV, Section 6 of the Maryland Constitution where the amount in controversy exceeds $500.00. This constitutional provision was amended by the Laws of 1969, Ch. 789, the amendment — increasing the amount to $500.00 from $5.00 — being adopted by the electorate at the election held on November 3, 1970. It is no vestigial anachronism from the early common law, but is current and in full vigor. Then too, the right to trial by jury is guaranteed to the inhabitants of Maryland by Article 5 of the Declaration of Rights of the Maryland Constitution, *i.e.,* they are entitled to "the trial by Jury, according to the course of that [the common] Law . . ." as well as by Article 23 of the Declaration of Rights providing, *inter alia,* that

there shall be no deprivation of life, liberty or property "but by the judgment of his peers . . . ." This right is also guaranteed in eminent domain cases by Article III, Section 40 of the Maryland Constitution. It is obvious that the right to trial by jury, first formally guaranteed in Magna Charta and guaranteed four times — either generally or in specific situations — in the Maryland Constitution is a valuable right, not lightly to be disregarded but to be "carefully guarded against infringement." See 50 C.J.S. *Juries* § 9, at 722 (1947) and the many cases cited in the notes to § 9.

Most certainly a proceeding involving the determination of the amount of a *penalty,* not exceeding $1,000.00, and of *damages* for tortious action, not exceeding $1,000.00, is a "civil proceeding" and most likely will exceed $500.00. The citizen has the right to have a jury determine these amounts upon proper evidence *in a court* and under proper instructions *by a court.* As I see it, without this fundamental right, the citizen's property is taken without the judgment of his peers and, indeed, without due process of law.

Alas, the majority opinion relegates the denial of trial by jury by the Act to a footnote (Footnote 12), stating that the Act makes no provision "for a de novo trial on appeal from the final action of the Commission" — which indeed it does not — and that this "does not constitute a deprivation of the right to a jury trial in violation of the Constitution of Maryland," bidding us to "See" *Branch v. Indemnity Insurance Co.,* 156 Md. 482, 144 A. 696 (1929); *Thomas v. Penn. R. Co.,* 162 Md. 509, 160 A. 793 (1932); and *Petillo v. Stein,* 184 Md. 644, 42 A. 2d 675 (1945). When one examines these cases, however, it is discovered that they *all* involved the Workmen's Compensation Law, which provided for a *de novo* trial on appeal *with* the right to a jury trial afforded. There is certain *dicta* in the three cases indicating that the absence of the right of trial by jury would not have rendered the Workmen's Compensation Law unconstitutional *on the theory* that proceedings before the Industrial Accident Commission *were not common law "civil proceedings,"* but were *special statutory proceedings,* unknown to the common law, and that the legislation establishing rights and amounts

was *in substitution* and *in lieu of* previously established common law rights and procedure. As I read these cases, it is rather clear that, but for this aspect of the Workmen's Compensation Law, the Act would have surely been declared unconstitutional if it had not provided for the right to a jury trial by a *de novo* appeal. *See Branch,* 156 Md. at 486-88, 144 A. at 697-98; *Thomas,* 162 Md. at 514-17, 160 A. at 795-96; and *Petillo,* 184 Md. at 648-49, 42 A. 2d at 677. *Also see* the strong dissenting opinion of Judge Offutt in which Judge W. Mitchell Digges concurred and the separate dissenting opinion of Judge Parke in the *Thomas* case, protesting against the *dicta* in *Branch,* in *Frazier v. Leas,* 127 Md. 572, 96 A. 764 (1916), and in *Solvuca v. Ryan & Reilly Co.,* 131 Md. 265, 101 A. 710 (1917) that a jury trial, as known to the common law, is no longer "an indispensable prerequisite to the constitutionality of the Workmen's Compensation Law." As already indicated, there is a substantial and vital distinction between the Workmen's Compensation Law — creating a new right and procedures unknown to the common law and in lieu of an established common law right — and a law establishing a Commission having the ability to fix the amounts of penalties and of damages resulting from tortious action, both well known to and arising out of the common law with no pretense that these "rights" are new and unknown to or in lieu of common law rights and practice.

As noted, the imposition of penalties is essentially a judicial function. Although described in § 93A-9(c) of the ordinance as a "civil" penalty, the penalty is actually *punishment* for violation of provisions of the ordinance or orders of the Commission in addition to the "criminal" penalty for the misdemeanor provided for in § 93A-44 of the ordinance. The provisions for the awarding of damages, termination of leases, payments for temporary substitute housing, and the ordering of repairs, return of security deposits and rental monies paid, in addition to being an exercise of judicial powers, appear to exhaust the possible "civil" remedies and leave the imposition of the "civil" penalty as punishment for disobedience rather than for "civil relief."

Therefore, in my opinion, the "civil penalty" partakes sufficiently of a criminal character to bring into play the usual civil rights applicable to criminal proceedings. *See Trop v. Dulles*, 356 U. S. 86, 97-99, 78 S. Ct. 590, 596-97, 2 L. Ed. 2d 630, 640-41 (1958); *Calder v. Bull*, 3 U. S. (3 Dall.) 386, 1 L. Ed. 648 (1798).

In *Trop*, Chief Justice Warren, for a majority of the Supreme Court of the United States, stated:

> "In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishment — that is, to reprimand the wrongdoer, to deter others, etc. — it has been considered penal. . . .
>
> "The purpose of taking away citizenship from a convicted deserter is simply to punish him. . . . Here the purpose is punishment, and therefore the statute is a penal law."
> 356 U. S. at 96-97, 78 S. Ct. at 595-96, 2 L. Ed. 2d at 639-40.

It is clear to me that the purported power given to the Commission by § 93A-9(c)(ii) to impose "a civil *penalty*, not in excess of $1,000, for the *violation* of any provision of this Chapter" (Emphasis supplied.) is intended to punish the violator. The *compensatory* provisions for the awarding of damages and the ordering of repairs follow in subparagraphs (iii) and (iv) of Subsection (c). Subparagraph (ii) is obviously intended to punish and deter, not to compensate. The full panoply of civil rights applicable to criminal proceedings therefore applies notwithstanding the word "civil" before penalty. *See Trop* and *Calder, supra.* Thus, for the additional reason that the Act does not purport to afford these civil rights when a penalty is sought to be imposed by the Commission, this provision of the Act is, in my opinion, unconstitutional.

Lest it be thought that the civil penalty and the damage provisions of the Act are of little financial consequence because of the $1,000 limitation, it should be observed that

the penalty up to $1,000 may be imposed for "violation of *any provision*" of the Act and the "actual" damages up to $1,000 may be imposed *"per affected dwelling unit"* — "dwelling unit" being defined in the Act (§ 93A-4(f)) as "that portion of a multi-family building, structure or facility of two or more units which is designated, intended or arranged for use or occupancy as a residence by *one or more persons.*" (Emphasis supplied.)

If the violation is a continuing one and if each day of continuance is deemed to be a violation, a person who had violated the Act for 150 days could be penalized up to $150,000.

If a landlord had an apartment complex containing 300 dwelling units, as defined, and maintained a "defective tenancy" defined as *"any* condition in a rental facility which constitutes a violation of the terms of the lease *or* any provision of this Chapter *or* constitutes a violation of *any* law, regulation or code" (§ 93A-4(e) — Emphasis supplied.), he might well have a violation common to all of the leases in the apartment complex so that the Commission would be empowered to impose an award of up to $300,000 — a rather tidy sum!

As already indicated, the opinions from the courts of Illinois, New Jersey, Massachusetts, Minnesota, Oregon, Utah and Washington, *i.e., Ford v. Environmental Protection Agency,* 9 Ill. App. 3d 711, 292 N.E.2d 540 (1973); [3] *Zahorian v. Russell Fitt Real Estate Agency,* 62 N.

---

**3.** The force of the Ford case (decided by the Appellate Court of Illinois for the Third District) as a precedent is gravely impaired by the decision of the Appellate Court of Illinois for the *Second* District on May 2, 1973 (subsequent to the decision in the Ford case) in City of Waukegan v. Environmental Protection Agency, 11 Ill. App. 3d 189, 296 N.E.2d 102 (1973). The Waukegan case held that power delegated to the Illinois Pollution Control Board to impose a penalty or fine up to $10,000 was an unconstitutional delegation of judicial power, specifically declining to follow the contrary decision in the Ford case. The Court stated in the Waukegan case:

"We believe, with due deference to the opinion of the Appellate Court, Third District, that the granting of power to the Illinois Pollution Control Board to impose a $10,000 fine is an unlawful delegation of the judicial powers to an administrative agency. We further believe that nothing is solved by labeling such a procedure

J. 399, 301 A. 2d 754 (1973); *Jackson v. Concord Co.*, 54 N. J. 113, 253 A. 2d 793 (1969); *Massachusetts Commission Against Discrimination v. Franzaroli*, 357 Mass. 112, 256 N.E.2d 311 (1970); *State v. Bergeron*, 290 Minn. 351, 187 N.W.2d 680 (1971); *Williams v. Joyce*, 4 Or. App. 482, 479 P. 2d 513 (1971); *Wycoff Co. v. Public Service Commission*, 13 Utah 2d 123, 369 P. 2d 283 (1962); and *Rody v. Hollis*, 81 Wash. 2d 88, 500 P. 2d 97 (1972), are, in my opinion, clearly inapplicable and unpersuasive in Maryland because of the different and unusual constitutional provisions in this State in regard to judicial power and its delegation. To repeat the words of Chief Judge Sloan in *Dal Maso:*

> "There may be states in which it [delegation of judicial authority to administrative boards] can be done, but Maryland is not one of them." 182 Md. at 205, 34 A. 2d at 466.

There are, however, two opinions of the highest courts of our sister states of New Mexico and North Carolina which are most persuasive in condemning as an unconstitutional delegation of judicial power the delegations here under discussion. These cases are *State v. Mechem*, 63 N. M. 250,

---

quasi-judicial; nor is this power to fine a mere mathematical calculation on data from which all reasonable minds would reach the same result. The Board here imposed fines of $1,000 and $250. These amounts might have been doubled as one Board member suggested, or they might have been any other amount up to a limit of $10,000. The imposition of a discretionary fine is a distinctly judicial act and one that cannot be exercised by an administrative body. Gradual erosion of the judicial power of the State in favor of administrative bodies endangers our system of government. There is no question by that the Illinois Pollution Control Board may hold hearings and make factual determinations; however, the imposition of a discretionary fine and the collection thereof must necessarily be a matter of judicial determination by a court." 11 Ill. App. 3d at 195, 296 N.E.2d at 107.

In view of the decision of the Supreme Court of Illinois in Reid v. Smith, 375 Ill. 147, 30 N.E.2d 908, 132 A.L.R. 1286 (1940), holding that the grant of power to the Illinois Department of Labor to impose a penalty of $10.00 a day for each laborer not receiving the prevailing wage provided for under the prevailing wage law was unconstitutional as an attempt to confer judicial power on the Department of Labor in violation of the provisions of the Illinois Constitution, the probabilities are that the Supreme Court of Illinois will adopt the reasoning in the Waukegan case rather than that in the Ford case.

316 P. 2d 1069 (1957) and *State ex rel. Lanier v. Vines*, 274 N. C. 486, 164 S.E.2d 161 (1968).

In *Mechem*, the Supreme Court of New Mexico held that a delegation by the legislature of that State to the Workmen's Compensation Commission of the power to decide questions of fact between private litigants and to make decisions having the force and effect of judgments was an unconstitutional delegation of judicial power and violated the provisions of the Constitution of New Mexico in regard to judicial power and its delegation which are similar to the applicable provisions of the Maryland Constitution.[4]

The Court in *Mechem* stated:

> "We think the function to be performed by the commission is clearly a judicial one. The commission is called upon to decide questions of fact between private litigants and is empowered to render decisions that have the force and effect of judgments. . . ."

> \* \* \*

> "We repeat, the right to determine controversies between individual litigants stems from Section 1, Article 6 of New Mexico Constitution. This power rests alone with the courts. No case has been cited, and our search fails to disclose one having constitutional provisions comparable with Section 1, Article 6, which supports relators' position. Possibly Maryland is the one exception, but there the commission cannot issue an enforceable

___

4. Article 3, Section 1 of the New Mexico Constitution provides:

"The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, . . . ."

Article 6, Section 1 of the New Mexico Constitution commits the judicial power of that state to designated courts.

judgment; the judgment must be that of the court to give it effect."
63 N. M. at 253-55, 316 P. 2d at 1071-72.

In *Lanier,* the Supreme Court of North Carolina held that the power delegated by the legislature to the Commissioner of Insurance to determine a civil penalty was an unconstitutional delegation of judicial power. Justice Lake, for that court, aptly stated:

> "The legislative authority is the authority to make or enact laws; that is, the authority to establish rules and regulations governing the conduct of the people, their rights, duties and procedures, and to prescribe the consequences of certain activities. Usually, it operates pro-spectively. The power to conduct a hearing, to determine what the conduct of an individual has been and, in the light of that determination, to impose upon him a penalty, within limits previously fixed by law, so as to fit the penalty to the past conduct so determined and other relevant circumstances, is judicial in nature, not legisla-tive. . . .
>
> ". . . One delegates his own authorities or powers, not those of another. A branch of the government, like an individual, may not delegate powers it does not have. The Legislature has, however, by this statute, undertaken to confer upon the Commissioner of Insurance a part of the judicial power of the State. . . ."

* * *

> "Decisions of this and other courts to the effect that the Legislature may delegate to administrative officers and agencies its own power to prescribe detailed administrative rules and regulations, so long as the Legislature, itself, prescribes the broad principles and standards within which such administrative authority is to be confined . . . are

not applicable to the present case. There, the question is whether the Legislature has sufficiently limited its own delegatee and thus has, itself, exercised the law-making power. Here, we are concerned with the extent to which the Legislature has undertaken to confer upon an administrative officer a power which the Legislature, itself, never had. Thus, we are not here concerned with whether the Legislature has or has not prescribed standards to guide and confine the administrative officer in his exercise of the power conferred. . . .

". . . [T]he Legislature has provided that when an insurance agent commits certain acts, or fails to do certain acts, such agent may, after a hearing, have inflicted upon him a civil penalty in an amount which may vary from a nominal sum to $25,000 for each such act or omission. Thus far, the statute is an exercise of the legislative power. . . . Obviously, however, someone must determine the amount of the penalty to be inflicted in each case. This application of the law, which has been enacted by the Legislature, to the facts found in a specific case, so as to make the penalty commensurate with the conduct of the agent in question, is of the essense of judicial power. . . ."
274 N. C. at 495-96, 164 S.E.2d at 166-67.

I think that Judge Moore put it well in his oral opinion when he stated:

"The Court finds great difficulty in characterizing these functions as being anything less than adjudicative and judicial in their nature."

* * *

"Certainly, the award of damages and the determination of damages is essentially, historically, traditionally a judicial function."

I would affirm Judge Moore in this regard.

469

(2)

*§§ 93A-26(b) and 93A-27(c) in Regard to
Two-Year Lease Terms.*

Sections 93A-26(b) and 93A-27(c) require that all leases entered into after the effective date of the Act be offered for an initial term of two years, unless a reasonable cause exists for offering an initial term of other than two years.

Article 21, Section 8-402(b)(4) and (5) — formerly Article 53, Sections 7 and 8 — of the Maryland Code provides:

"(4) To What Tenancies Applicable; Time of Notices Not Applicable in Baltimore City; Exception in Montgomery County.

"The provisions of Section 8-402(b) [regarding notices to quit] shall apply to all cases of tenancies from year to year, tenancies by the month and by the week. In case of tenancies from year to year (including tobacco farm tenancies), a notice in writing shall be given three months before the expiration of the current year of the tenancy, except that in case of all other farm tenancies, the notice shall be given six months before the expiration of the current year of the tenancy; and in monthly or weekly tenancies, a notice in writing of one month or one week, as the case may be, shall be so given; and the same proceeding shall apply, so far as may be, to cases of forcible entry and detainer. This subsection (4), so far as it relates to notices, shall not apply in Baltimore City. Nothing contained in the laws relating to landlord and tenant contracts shall be construed as preventing the parties, by agreement in writing, from substituting a longer or shorter notice to quit than heretofore required or to waive all such notice, provided the property to which such contract pertains is located in any special taxing area, or incorporated town of Montgomery County.

"(5) Effect of Notice from Tenant to Landlord of Intention to Move; Exception as to Baltimore City.

"When the tenant shall give notice by parole [parol] to the landlord or to his agent or representatives, at least one month before the expiration of the lease or tenancy in all cases except in cases of tenancies from year to year, and at least three months' notice in all cases of tenancy from year to year (except in all cases of farm tenancy, the notice shall be six months), of the intention of the tenant to remove at the end of that year and to surrender possession of the property at that time, and the landlord, his agent, or representative shall prove the notice from the tenant by competent testimony, it shall not be necessary for the landlord, his agent or representative to provide [prove] a written notice to the tenant, but the proof of such notice from the tenant as aforesaid shall entitle his landlord to recover possession of the property hereunder. This subsection (5) shall not apply in Baltimore City."

Judge Moore held §§ 93A-26(b) and 93A-27(c) invalid as being in conflict with the above-quoted provisions of the Maryland Code. He stated:

"We read Article 53, secondly, as authorizing tenancy at will and at sufferance, tenancy for specific periods of time, tenancies up to three years. This is permitted by Article 53.

"In the Court's judgment the requirement here in subsection (b) making it mandatory that they be offered for a specific period of time, two years, is a conflict of a direct nature."

In my opinion, Judge Moore was correct.

Even though tenancies from year to year, by the month and by the week existed at common law, Article 21, Section 8-402(b)(4) and (5) and their predecessor statutes, *recognize and permit leases for a definite term* and provide statutory procedure for enforcing the rights of the landlord after a proper notice to quit is given. The tenancies existing at common law are thus by a *public general law* of the State

*recognized and permitted* throughout the State. This, in my opinion, brings the matter within the purview of our statement in *Mayor & City Council of Baltimore v. Sitnick & Firey,* 254 Md. 303, 317, 255 A. 2d 376, 382 (1969). In *Sitnick,* Judge Finan, after a review of the Maryland cases, stated:

> "A distillation of the opinions we have cited leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted." (Emphasis in original.)

I would affirm Judge Moore in this regard also.

### (3)

*Dictum Indicating That Certain Parts of the Administrative Procedure Act (APA), Maryland Code Article 41, Sections 244-256A, Apply to Appeals From the Commission to the Circuit Court for Montgomery County.*

The majority, after holding the civil penalty provision unconstitutional for lack of guides and standards,[5] then proceeds by a most extraordinary *dictum* to indicate the "standard of judicial review" based upon part — but not all — of the provisions of § 255(g) of the APA! The majority states:

> "In this connection, we note that judicial review of final actions of the Commission shall be by 'appeal to the Circuit Court for Montgomery County in accordance with the Maryland Rules of Procedure for a review of such action.' §§ 93A-25 and 93A-45.

---

**5.** Adequate "guides and standards" are required for the constitutionality of the delegation of *legislative* powers by the General Assembly since otherwise the General Assembly would be delegating to an administrative body the "power to legislate" given *only* to the General Assembly by Article III of the Maryland Constitution. Bradshaw v. Lankford, 73 Md. 428, 21 A. 66 (1891). The requirement of adequate guides and standards has no application to attempted delegation of judicial powers which cannot be delegated by a legislative body *at all* — such a body not having judicial powers to delegate. State ex rel. Lanier v. Vines, supra, 274 N. C. at 495, 164 S.E.2d at 166.

472

Undoubtedly, the Council contemplated that review of the Commission's final action would be in accordance with Chapter 1100 of the Maryland Rules, Subtitle B, regulating appeals from administrative agencies, and authorizing the court to 'affirm, reverse or modify the action appealed from, remand the case to the agency for further proceedings, or dismiss the appeal as now or hereafter provided by law.' Rule B12. While neither the Act nor the Rules explicitly specify the substantive test to be applied in reviewing agency determinations, and the Administrative Procedure Act (APA), Maryland Code, Article 41, §§ 244-256A, is not by its terms applicable to county administrative agencies, *Urbana Civic v. Urbana Mobile*, 260 Md. 458, 272 A. 2d 628 (1971), we think the Council intended that the standard of judicial review be reconciled with that contained in § 255 (g) (1)-(5), inclusive, of the APA. See *County Fed. S. & L. v. Equitable S. & L.*, 261 Md. 246, 274 A. 2d 363 (1971). Section 255(g), insofar as pertinent, provides:

'The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; . . . .' "

Omitted from the "standard of judicial review" under the

Act are subparagraphs (6), (7) and (8) of § 255(g) of the APA, which provide:

"(6) Against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the agency and including de novo evidence taken in open court; or

(7) Unsupported by the entire record, as submitted by the agency and including de novo evidence taken in open court; or

(8) Arbitrary or capricious."

These omissions bode ill for appellants to the circuit court from the Commission's awards and orders, particularly the omission of subparagraph (8) — "arbitrary or capricious" — inasmuch as the majority had previously indicated that the power of the court to find the Commission's orders and awards to be "arbitrary or capricious" and thus to deny due process of law "saved," as it were, the sketchy appeal provided by the Act, relying (improperly, in my opinion) on *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 472-74, 84 A. 2d 847, 849-50 (1951), *supra.*

There is not a word in the Act which indicates that the APA, or any part of it, applies to appeals from final actions of the Commission to the circuit court. Sections 93A-45 entitled "Appeals" states:

"Any *person aggrieved* by a *final action* of the Commission rendered under this Article *may appeal* to the Circuit Court for Montgomery County *in accordance* with the Maryland Rules of Procedure for a review of such action." (Emphasis supplied.)

It will be observed that appeals to the circuit court are from a *"final* action" by the Commission and the *appeal* by a "person aggrieved" is to be in accordance with the Maryland Rules of Procedure. By this provision of the Act, Maryland Rules B1 to B12, relating to "Administrative Agencies — Appeal From" apply. These Rules do not provide for *any* "standard of judicial review" and, indeed, if they had tried to

do this, would have been an attempt to provide for a substantive legal matter, beyond the constitutional authority given to this Court by Article IV, Section 18A of the Maryland Constitution to adopt Rules of Procedure. As one would expect, the "Subtitle B" Rules are concerned with "procedure" relating to appeals from administrative agencies and, by the provisions of Rule B1 a and b would have been applicable to any appeal provided in the Act whether or not specifically mentioned in the Act itself.

The majority quotes Rule B12, which provides that "[t]he Court *shall affirm, reverse or modify* the action appealed from, remand the case to the agency for further proceedings, or dismiss the appeal *as now or hereafter provided by law*" (Emphasis added.) and then indicates that it thinks "the Council *intended* that the *standard of judicial review* be reconciled" with the standard contained in Section 255(g)(1)-(5) only of the APA.

The majority recognizes — as it must — that the APA by its explicit terms in § 244(a) *confines its application* to *State boards and commissions*, with certain exceptions. We have properly held that the APA *does not apply to the agencies of political subdivisions of the State.* In *Urbana Civic Ass'n v. Urbana Mobile Village,* 260 Md. 458, 272 A. 2d 628 (1971), we held that the Maryland B Rules, regulating appeals from administrative agencies, cannot — and do not — grant any right of appeal and, further, that the actions of the Planning Commission of Frederick County and of the County Commissioners of Frederick County were not reviewable under the APA. Judge Digges, for a unanimous Court, stated:

> "Nor are these actions reviewable under the Administrative Procedure Act since county agencies are not included within its provisions. Art. 41, §§ 244 and 255. *Hyson v. Montgomery County Council,* 242 Md. 55, 66, 217 A. 2d 578 (1966); *Bernstein v. Bd. of Education,* 245 Md. 464, 471, 226 A. 2d 243 (1967)."
> 260 Md. at 462, 272 A. 2d at 631.

*Urbana Civic Ass'n* is cited in the majority opinion, but its holding is not followed. Neither is it overruled. The majority relies upon our decision in *County Federal Savings & Loan Ass'n v. Equitable Savings & Loan Ass'n,* 261 Md. 246, 274 A. 2d 363 (1971) which indicated that when a *State agency* is involved — in that case the Board of Building, Savings and Loan Commissioners — the provisions of the Maryland B Rules in regard to appeals, of Article 23, Section 161H relating to appeals from the Board, and of the APA should be "reconciled," with particular reference to the scope of the *de novo* appeal provided in Article 23, Section 161H. This is a far cry, indeed, from "reconciling" the provisions of the APA with nonexistent provisions of the Act especially when the provisions of the APA itself *do not apply at all* to the Commission, as expressly provided in the APA and by the prior decisions of this Court! In sum, what the majority has done, as I see it, is to indulge in "judicial legislation" of a most aggravated type, adding, if you will, a nonexistent provision in regard to the "standard of judicial review" to § 93A-45 of the Act, which, in my opinion, would read as follows if it had been done by the County Council:

> "Upon review of such action, the Circuit Court for Montgomery County may, as provided in Code (1957, 1971 Repl. Vol.) Article 41, Section 255(g)(1) through (5), affirm the decision of the Commission or remand the case to it for further proceedings if the substantial rights of the person aggrieved may have been prejudiced because the Commission's findings, inferences, conclusions, or decisions are: (1) in violation of constitutional provisions; (2) in excess of the statutory authority or jurisdiction of the agency; or (3) made upon unlawful procedure; or (4) affected by other error of law; or (5) unsupported by competent, material, and substantial evidence in view of the entire record as submitted."

This, I suggest, is perhaps the "high watermark" of "judicial legislation" and is a rather lurid example of the

exercise *by this Court* of *legislative powers* contrary to the express provisions of Article 8 of the Declaration of Rights of the Maryland Constitution. As I see it, the majority is permitting the Commission to exercise *judicial powers* while it exercises forbidden *legislative powers.* "Ships that pass in the night and speak to each other in passing," [6] as it were.

I think applicable to this extraordinary addition to the Act by the majority is the statement of Chief Judge Prescott, for the Court, in *Amalgamated Casualty Insurance Co. v. Helms,* 239 Md. 529, 535, 212 A. 2d 311, 315-16 (1965):

> "Of course, the cardinal rule of statutory construction is to seek and carry out the true intention of the Legislature. *Casey Devel. Corp. v. Montgomery County,* 212 Md. 138. And in so doing, it sometimes becomes necessary, under unusual circumstances, to look to the spirit and purpose of an enactment. *Cearfoss v. State,* 42 Md. 403; *Bickel v. Nice,* 173 Md. 1; *Smith v. Higinbothom,* 187 Md. 115. But Chief Judge Marbury very clearly pointed out in *Clark v. Tawes,* 187 Md. 195, that the rule that real intent must prevail over literal intent is adopted only when the literal words of a statute say something that the Legislature could not possibly have meant. He said that *this Court has repeatedly stated that as a general rule a court may not surmise a legislative intention contrary to the plain language of a statute, nor insert or omit words to make the statute express an intention not evidenced in its original form.* See also *Pressman v. State Tax Comm.,* 204 Md. 78 and cases cited therein; and *Fowel v. State,* 206 Md. 101. And, if a statute be plain and free from ambiguity, its application may not be enlarged or extended by construction. *Grimm v. State,* 212 Md. 243." (Emphasis supplied.)

---

6. Longfellow, *Tales of a Wayside Inn,* "The Theologian's Tale: Elizabeth IV."

I also have grave doubts that the County Council could have, itself, adopted the addition to § 93A-45 of the Act in regard to the APA, which the majority has supplied by "construction." Inasmuch as the General Assembly has specifically held that the APA should apply *only to State agencies*, with certain exceptions, an enactment by the County Council of a part of the APA to be applicable to appeals from final actions of the Commission would appear to be in the teeth of the provisions of the APA — a public general law, and beyond the power of the County Council under the Express Powers Act. See Article XI-A, Section 3 of the Constitution of Maryland providing, in part, that where there is "any conflict between said local law [one passed by the legislative body of a chartered county] and any Public General Law now or hereafter enacted the Public General Law shall control." *See Heubeck v. Mayor & City Council of Baltimore*, 205 Md. 203, 208-10, 107 A. 2d 99, 102-03 (1954).

In addition to all of the above, the question of the "standard of judicial review" was not raised below, passed upon or decided by the lower court, or briefed or argued before us. The majority would have done well, in my opinion, not to have considered the question for the first time in the majority opinion. Maryland Rule 885.

Chief Judge Murphy, for the Court, put it well in *Small v. Secretary of Personnel of the State of Maryland*, 267 Md. 532, 536-37, 298 A. 2d 173, 175 (1973) in stating:

> "Small raises the additional question whether Article 64A is so vague and indefinite 'as to make the entire Statute unconstitutional or not subject to construction.' No argument whatsoever is advanced in support of the contention. Since the point was neither raised nor considered below, it is not properly before us. Maryland Rule 885."

We stated in *Baltimore County v. Letke*, 268 Md. 110, 117, 299 A. 2d 781, 785 (1973):

> "The County, for the first time on appeal, attempted to raise the questions in regard to possible indefiniteness of the terms of the contract

and that Mr. Redmond did not have authority to bind the County to the contract. These points not having been raised or decided below will not be considered by us on appeal. Maryland Rule 885."

At least in *Letke* the appellant raised on appeal the questions not raised below and they were briefed and argued before us. As indicated, not even this was done in regard to the addition to the Act of the "standard of judicial review" *via* part of § 255 of the APA. This, like Athena, sprang full grown from the head of Zeus.

I am authorized to state that Judge Smith concurs with the views herein expressed.